**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CAREFIRST ADVANTAGE PPO, INC.
1501 South Clinton Street
Baltimore, MD 21224

        Plaintiff,

   v.

DEPARTMENT OF HEALTH AND HUMAN
SERVICES
Hubert H. Humphrey Building
200 Independence Avenue, S.W.
Washington, D.C. 20201

CENTERS FOR MEDICARE & MEDICAID
SERVICES
7500 Security Boulevard
Baltimore, MD 21244

        Defendants.

Case No. 26-cv-150

## COMPLAINT

Plaintiff CareFirst Advantage PPO, Inc. ("CareFirst") files this Complaint against Defendants the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") (collectively, "Defendants"). CareFirst alleges as follows:

### INTRODUCTION

1.    CareFirst is the largest health care insurer in the Mid-Atlantic region and has been providing health solutions to millions of regional residents for decades. Among other health plans, CareFirst offers Medicare Advantage plans (Medicare Part C) and Medicare Prescription Drug plans (Medicare Part D). These Medicare plans are scored annually by CMS under its "Star Ratings" program to convey a measure of plan quality to the Medicare insurance market and

determine the plan's entitlement to certain payments. The financial implications of a Medicare plan's Star Rating in any given year are enormous.

2.    Star Ratings have become one of the most important aspects of the Medicare Advantage and Prescription Drug Plan ("PDP") programs. CMS assigns Star Ratings to Medicare plans based on a five-Star scale, set in half-Star increments, where one Star is the lowest rating, and five Stars is the highest rating. *See* 42 C.F.R. §§ 422.162(b), 422.166(h)(1)(ii), 423.182(b), 423.186(h)(1)(ii). To arrive at a numerical rating for each plan, CMS studies and surveys Medicare plans for quality, compliance, and other metrics. CMS compiles the results of these studies and surveys for each plan and issues a score for each measure. These measures are then aggregated on a weighted basis to arrive at an overall Star Rating for each plan. Star Ratings are complex and involve a multitude of measures, data, and calculations—and for that reason, Defendants set out detailed sub-regulatory guidance on how CMS utilizes the data sets and performs the calculations. In other words, CMS sets detailed rules of the road to explain the rationale for its actions so that all Medicare plans are treated the same, which is especially important given that so much depends on a plan's Star Rating.

3.    Indeed, Star Ratings have significant consequences. They are presented as an objective measure of Medicare plan quality: CMS holds out the Star Ratings to be a "true reflection of the plan's quality," based on data that are "complete, accurate, reliable, and valid." 83 Fed. Reg. 16440, 16520 (Apr. 16, 2018). In this way, Star Ratings influence Medicare beneficiaries' enrollment choices by distinguishing plans based on CMS's assessment of quality. Moreover, Star Ratings directly impact member benefits, in part because a plan's Star Rating determines the amount of funds CMS will pay to a plan in the form of a Quality Bonus Payment ("QBP"), paid

throughout the following year. QBPs are critical because the dollars are used to increase member benefits and reduce premiums.

4.       CareFirst offers Medicare Advantage plans and PDPs to approximately 30,000 members in Maryland. This lawsuit arises from the unlawful and arbitrary and capricious manner in which CMS calculated CareFirst's 2026 Star Rating, resulting in a lower Star Rating than it should have received. CareFirst's lower 2026 Star Rating is the direct result of CMS eschewing its regulations and guidance with respect to how it utilized certain data compiled and reported by its contractor, Acumen, LLC ("Acumen"), and then failing to explain the significance of it doing so. Given the nature of how Star Ratings are calculated from year to year, CMS's departure from its regulations and guidance, in combination with its failure to follow basic principles of administrative law, is classic arbitrary and capricious conduct.

5.       CareFirst's lower 2026 Star Rating will have significant negative impacts on CareFirst's revenue and ability to serve its members. Specifically, the lower rating will limit CareFirst's ability to provide competitive and meaningful benefits to Medicare Beneficiaries in the Washington D.C., Maryland, and Virginia service area as a result of the substantially reduced QBP. CareFirst seeks this Court's intervention to rectify that harm.

## JURISDICTION AND VENUE

6.       This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and raises questions under the federal Medicare law, 42 U.S.C. § 1395 *et seq.*

7.       CMS published CareFirst's 2026 Star Ratings on October 9, 2025. The publication of the Star Ratings is a final agency action.

8.    CareFirst has standing because it offers Medicare plans and Defendants incorrectly calculated CareFirst's 2026 Star Ratings with respect to at least one of its contracts with CMS. The 2026 Star Ratings published by CMS resulted in a lower rating for CareFirst than it should have received had CMS adhered to its regulations, guidance, and general principles of administrative law, in turn resulting in both reputational and substantial economic injury to CareFirst.

9.    Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against United States agencies and a substantial part of the events giving rise to CareFirst's claims occurred in this District.

10.    This Complaint is timely under 28 U.S.C. § 2401(a).

## PARTIES

11.    CareFirst is a Maryland corporation with a principal place of business of Baltimore, Maryland.

12.    CareFirst provides a full spectrum of health care plans and services to millions of members, many of whom are beneficiaries of the federal Medicare program.

13.    Among other Medicare contracts, CareFirst has entered into contract H7379 with CMS to provide coverage to Medicare beneficiaries under Medicare Parts C and D. Under contract H7379, CareFirst offers multiple Medicare plans covering approximately 30,000 members in Maryland.

14.    Defendant HHS is the department of the federal government that is ultimately responsible for the Medicare program. HHS has delegated its authority to administer the Medicare program to CMS. *See* 66 Fed. Reg. 35437 (June 29, 2001).

15.    Defendant CMS is a federal agency within HHS that is primarily responsible for administering the Medicare program. *See id.*

## FACTUAL ALLEGATIONS

### I.    The Medicare Program

16.    Medicare is a federal program that provides health insurance benefits for Americans aged 65 years and older and certain disabled persons. *See* 42 U.S.C. § 1395 *et seq.*

17.    CMS is the federal agency responsible for administering the Medicare program.

18.    Medicare is divided into different parts to cover various aspects of health care. Medicare Part A covers inpatient hospital stays, skilled nursing facilities, hospice care, and some home health care. Medicare Part B covers outpatient care, doctor visits, preventative services, certain home health care, and durable medical equipment. 42 U.S.C. §§ 1395c to 1395i-6 (Part A); 42 U.S.C. §§ 1395j to 1395w-6 (Part B). Under Medicare Parts A and B—together referred to as "traditional" or "original" Medicare—the federal government itself acts as the insurer and directly pays providers for services rendered to Medicare beneficiaries.

19.    In 1997, through the Balanced Budget Act, Congress created Medicare Part C, which in 2003 became known as Medicare Advantage. 42 U.S.C. § 1395w-21 *et seq*. Medicare Advantage allows individuals to receive Medicare benefits through private health insurers that contract with the federal government.

20.    The Medicare Advantage program, which has proven to be an incredibly popular option among Medicare beneficiaries, is intended to shift the financial risk of providing health care for Medicare beneficiaries from the federal government to privately run plans in exchange for a per-member, per-month payment.

21.     Medicare Advantage plans must provide members with at least the same level of benefits offered by traditional Medicare. Medicare Advantage plans combine coverage from both Parts A and B and are often offered with prescription drug coverage under Medicare Part D, which was introduced in 2003 as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066 (2003), specifically to provide prescription drug benefits. 42 U.S.C. § 1395 *et seq*.

22.     Through the 2003 MMA, Congress overhauled Medicare and significantly altered the way Medicare Advantage plans are paid. The MMA set the minimum payment for private plans to at least as high as traditional Medicare spending per enrollee. These payments are paid on a pre-determined monthly sum for each Medicare beneficiary. *Id.* at § 1395w-23.

23.     The MMA also established an annual bidding process, whereby plans must submit a bid by the first Monday in June of each year that represents the estimated cost for the plan to provide basic Medicare benefits to members for the coming year, including administrative overhead and profit. *See id.* § 1395w-23(a)(1)(B). If the plan's bid is lower than the county-level benchmark set by CMS based on traditional Medicare spending per enrollee, CMS returns a portion of the savings to the plans as a "rebate," which the plan can use to fund additional benefits or reduce premiums (or both). *See id.* at § 1395w-23(a)(1)(E).

## II.     Star Ratings and their Financial Impact to Medicare Advantage Plans

### A.  Background on Medicare Star Ratings

24.     Medicare Star Ratings are a key component of the Medicare program, designed to measure the quality of care provided by Medicare plans. Even before the Star Ratings system of today, Medicare Advantage plans were required to have arrangements for "an ongoing quality improvement program." *Id.* at § 1395w-22(e)(1). CMS has published data about plan quality and

performance since 1998. *See* 83 Fed. Reg. at 16520. Reported plan data include performance measures from the Healthcare Effectiveness Data and Information Set ("HEDIS") and Consumer Assessment of Healthcare Providers and Systems ("CAHPS") surveys. *See* 69 Fed. Reg. 46866, 46886 (Aug. 3, 2004).

25.    In 2007, CMS officially introduced the Medicare Star Ratings system. CMS develops and publicly posts a five-Star rating system for Medicare plans as part of its responsibility to disseminate comparative information, including information about quality, to Medicare beneficiaries under sections 1851(d) and 1860D–1(c) of the Social Security Act and based on the collection of different types of quality data under section 1852(e). 42 U.S.C. §§ 1395w-21(d), 1395w-101(c), and 1395w-22(e).

26.    Star Ratings are based on a five-Star scale, set in half-Star increments: one Star is the lowest rating, and five Stars is the highest rating. *See* 42 C.F.R. §§ 422.162(b), 422.166(h)(1)(ii), 423.182(b), 423.186(h)(1)(ii).

27.    Star Ratings are designed to accurately reflect a "plan's quality" and are supposed to be based on data that are "complete, accurate, reliable, and valid." 83 Fed. Reg. at 16520.

### B.  How Medicare Star Ratings are Calculated

28.    The Star Ratings are based on the scores plans earn on various quality and performance "measure[s]." *See* 42 C.F.R. §§ 422.162(a), 423.182(a). For example, for the 2026 Star Ratings, Medicare Advantage Prescription Drug (MA-PD) contracts were rated on up to 43 unique quality and performance measures, Medicare Advantage-only contracts (without Part D coverage) were rated on up to 33 measures, and PDP contracts were rated on up to 12 measures.

29.     If a Medicare plan consistently receives Star Ratings below three Stars, it may be terminated from the Medicare program. *See* 42 C.F.R. §§ 422.510(a)(4)(xi), 423.509(a)(4)(x).

30.     To calculate a Medicare plan's overall Star Rating, each measure receives a measure-specific numerical score based on an analysis of the data identified by CMS for that measure. CMS then converts that numerical score into a measure-specific Star Rating on a five-Star scale by determining "cut points" to separate each measure into the whole Star increments. 42 C.F.R. §§ 422.166(a)(4), 423.186(a)(4).

31.     Measure-level Star Ratings involve the use of various data sources. In addition, the measure scores for all contracts involve the conversion of granular data across the industry into cut points, so even minor data changes can result in movements in the cut points that in turn can lead to significant changes in a Medicare plan's measure-specific Star Ratings. Because those measure-specific Star Ratings are then used on a weighted basis to calculate the overall Star Rating, small changes in the cut points can profoundly impact a plan's overall Star Rating.

32.     CMS prominently displays Star Ratings online and in print resources, as required under the Social Security Act. *See* 42 U.S.C. § 1395w-21.

33.     The measures are intended by CMS to aid Medicare beneficiaries in comparing the quality of health plans and selecting a plan. Prospective Medicare plan members may view the ratings online through CMS's Medicare Plan Finder website. This tool displays all Medicare plans available for enrollment to a Medicare beneficiary, and it ranks the plans from highest to lowest by their Star Ratings.

## C.   *The Quality Bonus Payment for Medicare Advantage Plans*

34.     Initially, the primary purpose of Star Ratings was to inform Medicare beneficiaries about quality when choosing a plan, and to help CMS identify low performing plans for

compliance actions. *See* 75 Fed. Reg. 71190, 71219 (Nov. 22, 2010). In 2010, the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), introduced the Quality Bonus Payment program. The ACA provides that a Medicare Advantage plan is entitled to a Quality Bonus Payment ("QBP") from CMS depending on the "quality rating" of the plan, which "shall be determined according to a 5-star rating system." 42 U.S.C. § 1395w-23(o)(4)(A).

35.    The QBP program incorporated Star Ratings into two statutory formulas that are used to determine certain payments to Medicare plans. *See* 42 C.F.R. §§ 422.160(b)(2), 423.180(b)(2); 75 Fed. Reg. at 71218. The first, codified at 42 U.S.C. § 1395w-23(o), rewards Medicare plans rated four Stars or higher with an increased benchmark against which to bid. The second, codified at 42 U.S.C. § 1395w-24(b)(1)(C), gives higher-rated plans a larger portion of the difference between their bid and their benchmark back as a rebate. That is, when Medicare Advantage plans project expenses below a CMS-determined benchmark, a portion of the savings is returned to the plan and can be used to offer supplemental benefits to Medicare beneficiaries.

36.    Through the QBP, the amount of rebate dollars paid varies based on Star Rating: plans at or above 4.5 Stars retain 70 percent of the difference as rebate dollars; plans at 3.5 or 4 Stars retain 65 percent; and plans at or below 3 Stars retain only 50 percent.

37.    Furthermore, Star Ratings can impact plan payment by making more funds available to spend on supplemental benefits for enrollees. If a Medicare Advantage plan receives a Star Rating of four Stars or higher, its benchmark amount is increased, in turn increasing the rebates that CMS will pay by increasing the difference between the plan sponsor's benchmark and its bid. 42 U.S.C. § 1395w-23(o)(1), (3)(A).

38.     A higher-rated plan that retains more rebate dollars can therefore provide more supplemental benefits or lower premiums to its enrollees. Therefore, these QBPs are critical for Medicare plans, as they serve as both a financial incentive for delivery of high-quality care to enrollees and a strategic tool to enhance competitiveness in the market.

39.     For example, plans may, but are not required to, use the QBPs to offer enhanced benefits that are not covered by traditional Medicare, such as dental, vision, and hearing. If a plan otherwise wanted to enhance benefits, it would have to find an actuarial offset either in reducing other supplemental benefits or charging more. Plans can also use the payments to lower premiums, co-payments, or deductibles. The cost of premiums and co-payments is usually a significant factor for beneficiaries when selecting a plan, and lower costs can therefore give a plan a distinct edge among competitors.

40.     A Medicare plan's Star Rating in one year will thus affect its revenue for the following year and its bidding strategy. Star Ratings translate into higher quality bonuses, which can supplement the plan's overall revenue. A plan's Star Rating and corresponding bonus payment will impact market competitiveness, as the additional funding may allow the plan to offer lower premiums and richer benefits which could attract members. Thus, Star Ratings have tremendous value to Medicare plans.

41.     The Star Ratings system works through a staggered, multi-year cycle, with measures in any given year being measured through various data sets. For instance, to calculate the 2026 Star Rating, CMS relied upon data from calendar year 2024 for certain measures.

42.     Final Star Ratings are generally officially published in October, and enrollment periods typically commence the same month.

43.     A QBP that results from a Star Rating is finalized in April of the Star Rating year but not paid until the following year. Thus, QBPs stemming from 2026 Star Ratings are finalized by mid-April 2026 and paid out to the receiving plans in 2027 in the form of a higher benchmark and greater percentage of rebate allowance based on their assigned rating from the prior year. Plans need the finalized Star Rating by mid-April to ensure that they can submit their annual bids to the government, which are due the first Monday of June.

44.     A Medicare Advantage plan that does not receive the QBP status determination to which it believes it is entitled (because its Star Rating is lower than the plan believes it should be) may request reconsideration by CMS and, if still not satisfied, an informal hearing. 42 C.F.R. §§ 422.260(c)(1), (2).

45.     The scope of this informal process is very limited, focusing on "a calculation error" or the use of certain categories of "incorrect data," and "limited to those circumstances where the error could impact an individual measure's value or the overall Star Rating." 42 C.F.R. § 422.260(c)(1)(i). For example, and importantly, a plan may not challenge CMS's methodology for calculating a Star Rating (including the calculation of the overall Star Rating). *See* 42 C.F.R. § 422.260(c)(3)(ii).

46.     Moreover, CMS regulations expressly state that a Medicare Advantage plan may not request a review based upon data inaccuracies arising in a number of data sources, including Prescription Drug Event ("PDE") data. *See id.* at § 422.260(c)(3)(iii).

47.     The following depicts the typical schedule of key annual events relevant to the development of Medicare Star Ratings:

| Medicare Star Ratings – Key Annual Events | |
|---|---|
| First Monday in June | Statutory bid deadline |

| Late June | Final Prescription Drug Event (PDE) submission deadline |
|---|---|
| Late July | Final patient safety reports released (approximately one month after PDE submission deadline) |
| August/September | Plan Previews 1 and 2 |
| Early- to Mid-October | Star Ratings published on Medicare Plan Finder |
| October 15 – December 7 | Annual Election Period |
| January 1 to March 31 | Medicare Advantage Open Enrollment |
| April | QBP finalized (to be paid the following year) |

## III.    Drug Plan Quality Improvement Measure

### A.    Calculating the Drug Plan Quality Improvement Measure

48.    Among the measures that CMS assessed in connection with its calculation of the 2026 Star Ratings is the "Drug Plan Quality Improvement Measure." This measure is intended to show how much a drug plan's performance has improved or declined from one year to the next year. CMS labels the Drug Plan Quality Improvement Measure with the alphanumeric identifier "D04," and the measure is weighted to the maximum possible Star Ratings weight of 5.

49.    Whereas other Star Ratings measures are derived from member performance data in a given year, the Drug Plan Quality Improvement Measure is calculated by comparing a contract's current and prior year's measure scores.

50.    For the measures that feed into the Drug Plan Quality Improvement Measure, plans strive to achieve a status of "significant improvement" between the relevant years compared.

51.    For purposes of calculating the Drug Plan Quality Improvement Measure, the equation's numerator is the net improvement (the weighted sum of the number of "significantly improved" measures minus the number of "significantly declined" measures), and the denominator

is the sum of the weights associated with the measures eligible for the Drug Plan Quality Improvement Measure. Significant improvement would be achieved for each measure if the sum of the improvement change score (*i.e.*, the difference between 2025 and 2026 scores) divided by its standard error was greater than 1.96.

52.     For 2026 Star Ratings, the measures that make up the Drug Plan Quality Improvement Measure are: "Call Center – Foreign Language Interpreter and TTY Availability" (D01), "Complaints about the Drug Plan" (D02), "Members Choosing to Leave the Plan" (D03), "Rating of Drug Plan" (D05), "Getting Needed Prescription Drugs" (D06), "MPF Price Accuracy" (D07), "Medication Adherence for Diabetes Medications" (D08), "Medication Adherence for Hypertension (RAS antagonists)" (D09), "Medication Adherence for Cholesterol (Statins)" (D10), "MTM Program Completion Rate for CMR" (D11), and "Statin Use in Persons with Diabetes (SUPD)" (D12). Each of these measures flows into the calculation of the overall Drug Plan Quality Improvement Measure.

53.     The Medication Adherence for Hypertension measure (D09), is at the heart of this lawsuit. D09 measures the percentage of plan members with a prescription for a blood pressure medication who fill their prescription often enough to cover 80% or more of the time they are taking the medication.

54.     This percentage is calculated as the number of continuously enrolled beneficiaries, 18 years and older, with a proportion of days covered of 80 percent or higher for renin-angiotensin-system ("RAS") antagonist medications during the measurement period (numerator), which is then divided by the number of continuously enrolled beneficiaries, 18 years and older, with at least two RAS antagonist medication fills on unique dates of service during the measurement period, and a treatment period that is at least 91 days during the measurement year (denominator).

55.     The data for the Medication Adherence for Hypertension measure come from PDE data submitted by plans to CMS. For 2026 Star Ratings, the data for this measure encompassed dates of service from January 1, 2024 through December 31, 2024.

56.     For 2026 Star Ratings, to determine whether there was "significant improvement" for the Medication Adherence for Hypertension measure, CMS compared CareFirst's calendar year 2026 measure score against its calendar year 2025 measure score (the data for the latter encompassing dates of service from January 1, 2023 through December 31, 2023). The numeric improvement (or decline) is the delta between the earlier (2023) year-of-service score and the later (2024) year-of-service score.

### B. Drug Plan Quality Improvement Measure Data, Patient Safety Reports, and Related CMS Guidance

57.     As CMS acknowledges in its Star Ratings technical notes, the agency does not automatically provide plans with the raw numeric results for the Drug Plan Quality Improvement Measure. In fact, it does not even publish the raw overall Drug Plan Quality Improvement Measure score (as it does for other measures). For Star Ratings "preview" purposes, CMS provides plans with only the ultimate measure rating (*i.e.*, a measure Star Ratings 1 through 5) for the Drug Plan Quality Improvement Measure.

58.     CMS contracts with Acumen, a policy analysis service provider, to process the relevant patient safety data and issue patient safety reports that are relevant to the calculation of the Drug Plan Quality Improvement measure calculation.

59.     Final patient safety reports containing data from the preceding year are routinely released in July of each year, and these final patient safety reports determine the patient safety measure scores (including the Medication Adherence for Hypertension measure) that will factor into CMS's calculation of a plan's Star Rating for the following year (*e.g.*, 2023 performance data

would be reported on in July 2024 for use in calculating the 2025 Star Ratings). This is in line with the agency's precisely planned—and statutorily rooted—calendar for Medicare Advantage plan bid submissions, plan preview periods, and enrollment periods.

60.     So that plans may with confidence work this finely tuned calendar into their business operations, CMS confirms in advance when to expect these critical, final patient safety reports. On April 20, 2023, CMS confirmed via a guidance memorandum to plans entitled "UPDATES – 2023 Medicare Part D Patient Safety Reports" (the "April 2023 Guidance") that "[t]he final YOS [year-of-service] 2023 Patient Safety Reports will be released in July 2024, one month after the submission deadline for 2023 PDE records to CMS..."

61.     Simply put, CMS told Medicare plans that the YOS 2023 data released in July 2024 would be the data plans could rely on to calculate the relevant measure scores for use in the 2025 Star Ratings. Consistent with this, on July 31, 2024, CMS (through Acumen) did in fact release the YOS 2023 patient safety reports (the "July 2024 Report").

62.     During the first plan preview period for the 2025 Star Ratings, which ran from August 7 to 14, 2024, CMS released Star Ratings data through CMS's Health Plan Management System (HPMS) that appeared to be, and were, consistent with the July 2024 Report. Then, during the second plan preview period, which ran from September 6 to 13, 2024, CMS released additional Star Ratings data via HPMS that again, appear to be and were consistent with the July 2024 Report.

63.     *Two weeks after the close of this second preview period*, on September 30, Acumen sent an email communication to certain plan representatives stating that the July 2024 Report did *not* in fact contain the final reports, but the content of that transmittal downplayed any significance associated with the updated reports. In its email to plans, Acumen briefly noted that "[t]he YOS 2023 Patient Safety Report Package zip files have been re-uploaded to replace the zip files that

were uploaded on July 31, 2024." The email stated further that Acumen had "identified and corrected a minor technical issue in the process that assigns and links PDE and Common Working File (CWF) claims to beneficiaries that impacted a small fraction of beneficiaries."

64.    The new September 2024 Report, which replaced the July 2024 Report, carried the subject line "Patient Safety – Updated Year of Service (YOS) 2023 Reports Available" (without emphasis or mention of any significance) and downplayed any significance to these corrections—indicating only that "[t]he impact to the YOS 2023 Patient Safety measure rates for most contracts was marginal or unchanged." As it turns out, despite CMS's statement in the April 2023 Guidance that it would use the data reported in the July 2024 Report for purposes of calculating a plan's 2025 Star Ratings, CMS did *not* use the data contained in the July 2024 Report in its 2025 Star Ratings calculations. Rather, it used the "corrected" data contained in the September 2024 Report to calculate CareFirst's (and other plans') 2025 Star Ratings.

65.    Acumen minimized the import of the "technical" corrections reflected in the September 2024 Report and CMS did not make any additional statements of its own about the import of the September 2024 Report, so CareFirst had no reason to suspect at the time that anything significant was amiss. There was no communication to plans regarding either the error or the decision to change course on the April 2023 Guidance via the typical route—CMS's HPMS.

66.    Moreover, the Acumen technical correction email, released on September 30, 2024, came more than two weeks *after* the second 2025 Star Rating preview period had already ended on September 13. Therefore, Acumen's September 30 email came at a time when plans had no expectation of receiving communications from Acumen or CMS about final patient safety reports, much less notification of an error outside of the plan preview period, and left no opportunity to raise any concerns about the data with CMS in a timely manner.

67.     CareFirst had no reason on the face of these reports to question Acumen's characterization of its technical correction: CareFirst's 2025 Star Rating did not change as a result of the technical correction, so the plan had no reason to be concerned or even think the technical error impacted CareFirst's data at all, the "impact" of which on "measure rates for most contracts was," by Acumen's own telling, "marginal or unchanged."

68.     Additionally, and perhaps most telling that CMS and Acumen knew the correct report to use in accordance with its own guidance was the July 2024 Report, the September 2024 Report was backdated. The report lists "July 31, 2024" as the "Date of Report" despite the fact that Acumen had changed and re-uploaded this file.

69.     CMS for its part shed no additional light on the changes or the potential importance of those changes.

**IV.    CareFirst's 2026 Star Ratings Score**

70.     For 2026 Star Ratings, the first plan preview period took place between August 6 and August 13, 2025, and the second plan preview took place in early- to mid-September, 2025. CMS published CareFirst's 2026 Star Ratings on October 9, 2025.

71.     It was not until CareFirst reviewed a lower-than-expected 2026 Star Rating as part of the 2026 Star Rating plan preview process for the Drug Plan Quality Improvement measure that it became aware of the true impact of CMS's unlawful and arbitrary departure from its guidance the preceding year.

72.     As noted above, the numeric improvement (or decline) for this particular measure is the delta between the earlier (2023) year-of-service score and the later (2024) year-of-service score. Based on its review and understanding of the two sets of data made available to it by CMS (in 2024 and 2025, respectively), CareFirst had an expectation of receiving a 4-Star Rating for the

Drug Plan Quality Improvement measure for its 2026 Star Rating calculation, which in turn would have resulted in an overall 4-Star Rating.

73.    CMS's measure rates that are made available to plans via HPMS during the plan preview process only show whole numbers, not raw, detailed data actually used to arrive at the scores.

74.    Upon receiving CMS's preview of a lower 2026 Star Rating for the Drug Plan Quality Improvement Measure for the plan than it expected, CareFirst promptly requested from CMS, on September 9, 2025, the raw numeric scores underlying its rating and performed an internal review to understand why its measure score was not the 4 Stars it had been expecting.

75.    Through its internal review of the detailed calculations that it had to request from CMS, which provide more precise measurements, CareFirst discovered that the "corrected" reports released by Acumen in September 2024 as part of the 2025 Star Rating process had resulted in one plan member's Hypertension Medication Adherence data "flipping" from non-adherence to adherence.

76.    As a result, CareFirst's raw numeric score was slightly elevated in the September 2024 Report from where it had been in the July 2024 Report. As a result of that slight bump in the YOS 2023 PDE data (used to calculate the Hypertension Medication Adherence score that factored into the Drug Plan Quality Improvement Measure as part of the 2025 Star Ratings), the "improvement" in the YOS 2024 PDE data (used to calculate the Hypertension Medication Adherence score that factored into the Drug Plan Quality Improvement Measure as part of 2026 Star Ratings) was ever-so-slightly under the mark CareFirst was required to meet to earn a 4-Star Rating for the Drug Plan Quality Improvement Measure, and thus an overall 4-Star Rating for 2026.

77.     The following depicts the typical schedule of key Medicare Star Ratings events for this lawsuit:

| CareFirst 2026 Star Ratings – Key Periods and Events | |
| --- | --- |
| Calendar Year 2023 | Measurement period with the performance data that serve as a baseline for CareFirst's 2026 Star Rating Drug Plan Quality Improvement Measure |
| June 3, 2024 | Statutory bid deadline |
| June 28, 2024 | Final PDE submission deadline |
| July 31, 2024 | Final patient safety reports for YOS 2023 released |
| August 7 – 14, 2024 | Plan Preview 1 for 2025 Star Ratings |
| September 6 – 13, 2024 | Plan Preview 2 for 2025 Star Ratings |
| September 30, 2024 | Acumen issued "corrected" patient safety reports |
| October 10, 2024 | 2025 Star Ratings published |
| October 15, 2024 | Annual Election Period commences |
| January 1, 2025 | Medicare Advantage Open Enrollment commences |
| June 2, 2025 | Statutory bid deadline |
| June 27, 2025 | Final PDE submission deadline |
| July 31, 2025 | Final patient safety reports for YOS 2024 released (the YOS 2024 performance data is used to calculate the Drug Plan Quality Improvement Measure for 2026 Star Ratings against the YOS 2023 baseline score) |
| August 6 – 13, 2025 | Plan Preview 1 for 2026 Star Ratings |
| Early- to Mid-September, 2025 | Plan Preview 2 for 2026 Star Ratings |
| September 15 – 18, 2025 | CareFirst raises to CMS the agency's mistake in not using the July 2024 data |
| October 9, 2025 | 2026 Star Ratings published |
| October 15, 2025 | Annual Election Period commences |

| January 1, 2026 | Medicare Advantage Open Enrollment commences |
| June 1, 2026 | Statutory bid deadline |
| June 29, 2026 | Final PDE submission deadline |
| 2027 | Quality Bonus Payment stemming from 2026 Star Ratings paid |

## V.    CMS's Unlawful and Arbitrary Actions Injure CareFirst

78.    CareFirst estimates economic losses of approximately $32 million resulting from the lower 2027 Quality Bonus Payment it is now set to receive as a result of CMS using the YOS 2023 PDE data as reported in the September 2024 Report to calculate the 2025 Star Ratings instead of the July 2024 Report as required by the April 2023 Guidance.

79.    CMS's unexplained departure from its April 2023 Guidance is contrary to law. Had CMS adhered to its April 2023 Guidance, the data reported by Acumen in the July 2024 Report (including the YOS 2023 PDE data) would have been utilized by CMS for purposes of the 2025 Star Ratings calculations, not the later-reported data that was reported only after the close of the second review period, and the importance of which was downplayed by Acumen and went unaddressed entirely by CMS. Using the data as reported in the July 2024 Report for purposes of the 2025 Star Ratings score would have resulted in CareFirst receiving a 4-Star measure and overall rating for 2026.

80.    CMS's lack of transparency about the impact of Acumen's replacement of the July 2024 Report with its September 2024 Report also deprived CareFirst of adequate notice of the change and an opportunity to be heard to protect its interests in QBP payments that are determined in accordance with statute, regulations, and guidance.

81.    Because the information reported by Acumen obscured any change to CareFirst's Drug Plan Quality Improvement Measure score as part of the 2025 Star Rating, CareFirst had no

reason to suspect that the September 2024 Report had the potential to skew its performance objectives for the following Star Rating year.

82.     Moreover, by utilizing data reported by Acumen only after the close of the preview period, CMS denied CareFirst any process to raise an objection in the plan preview period. But even worse, because of Acumen's opacity and CMS's inaction, CareFirst was denied even an informal opportunity to raise an objection to CMS. Had the magnitude of the change to CareFirst's raw score for the Medication Adherence for Hypertension measure component of the Drug Plan Quality Improvement Measure been identified to CareFirst rather than obscured, CareFirst could have at least objected to CMS at the time about the agency's departure from its April 2023 Guidance.

83.     Perhaps most importantly, as is true of any health plan, or any business for that matter, the ability to plan, set business objectives, and perform in satisfaction of those objectives is vitally important to CareFirst. CMS's actions—or inaction—in 2024, as part of the 2025 Star Ratings process, arbitrarily and capriciously deprived CareFirst of the ability and opportunity to adjust its performance objectives for 2024 and then perform to those adjusted objectives in the lead-up to the 2026 Star Ratings process.

84.     Finally, even accepting the September 2024 Report data on its own terms—despite Acumen downplaying its significance and CMS doing nothing of its own to explain the materiality of the change in data or why the agency was departing from its April 2023 Guidance to use the data as reported by Acumen in its July 2024 Report—CareFirst still only missed the mark by a statistically insignificant margin. The result is that CareFirst fell short of achieving significant improvement by a numerically minimal margin; however, because CMS assigns the Drug Plan

Quality Improvement Measure the highest weighting (5x), this margin had a disproportionate adverse effect on the plan.

## VI.    CareFirst Petitioned CMS for Relief to No Avail

85.    On September 15, 2025, during the second plan preview period for the 2026 Star Rating, CareFirst emailed CMS to inquire about the improvement scores for the Medication Adherence measures, noting that the rates used for the baseline 2025 Star Rating did not match the rates in the final, July 2024 Report.

86.    CMS responded that the final YOS 2023 July Patient Safety Report Package zip files were re-uploaded to replace the zip files that were originally uploaded on July 31, 2024 due to "minor technical issues in the process that assigns and links Prescription Drug Event (PDE) and the Common Working File (CWF) claims to beneficiaries, which impacted a small fraction of beneficiaries." CMS also stated that it explained in a prior email notification to all Part D contracts that the YOS 2023 Patient Safety measure rates for most contracts was "marginal or unchanged."

87.    In seeking relief from CMS, CareFirst explained the impact of Acumen's replacement of the July 2024 data as follows:

> The stakes of this calculation are substantial. Reaching significant improvement would improve our Part D QI rate to 0.4705888 and to 4 Stars (from 3 Stars). This would then move our Overall Star Rating from a 3.5 to a 4.0 overall. The difference between receiving 3.5 Stars versus 4.0 Stars equates to only 0.64 of a single member. This outcome does not reflect the reality of our performance nor the goals of the Stars program.

88.    In CMS's email responses, it characterized the issue raised by CareFirst as requesting a "change to the methodology," which is not appealable under CMS's regulations. *See* 42 C.F.R. § 422.260(c)(3)(ii).

89.    Given CMS's characterization of CareFirst's request as one seeking a "change to

the methodology," CareFirst does not have any other viable administrative review process available to it. As noted above, although CMS offers an informal, and narrowly tailored, review of QBP status determinations, it expressly excludes from that review process challenges to "the methodology for calculating the star ratings (including the calculation of the overall star ratings)," "the set of measures included in the star rating system," and PDE data accuracy, *inter alia*. *See* 42 C.F.R. §§ 422.260(c)(3)(ii), (iii).

90.    Even still, and out of an abundance of caution, CareFirst submitted a request for reconsideration to CMS pursuant to its informal QBP review process so as not to unwittingly waive any rights. In that request, CareFirst made clear that CMS's own characterization of the dispute as relating to a "change to the methodology" rendered the dispute outside of the administrative appeals process in accordance with 42 C.F.R. § 422.260(c)(3)(ii), but asked that CMS immediately advise CareFirst if its understanding was incorrect so that it may supplement its request with additional documentation:

> Given that 42 C.F.R. § 422.260(c)(3)(ii) states that "an administrative review cannot be requested for . . . the methodology for calculating the star ratings (including the calculation of the overall star ratings) [or] cut-off points for determining measure thresholds," it is CareFirst's understanding that the issues raised herein are not subject to and cannot be brought in the administrative review process. However, CMS has not expressly clarified the meaning of this provision in regulation or guidance. Therefore, in the abundance of caution and in the event that CareFirst's understanding is incorrect and the administrative process is available to address any issues raised herein, please contact the CareFirst designated representative immediately so that CareFirst can submit additional documentation if appropriate. CareFirst reserves all rights, remedies, claims, arguments and otherwise with respect to H7379 and the issues raised herein.

91.    CMS did not contact CareFirst as requested. Instead, on January 15, 2026, CMS emailed CareFirst its "Technical Report," in which it failed to acknowledge its prior characterization and applicable regulations excluding methodological disputes from the

administrative appeals process. Rather, CMS opined in its "Technical Report" that "CMS finds no evidence that we incorrectly calculated the Star Rating or measure score for D04. Therefore, the overall rating (QBP rating) for H7379 should remain unchanged."

92.    Because CareFirst has not and cannot at this point obtain relief directly from CMS, it files this lawsuit.

## CLAIM FOR RELIEF

**The October 9, 2025 Star Ratings Release for CareFirst's Medicare Advantage Contract H7379 is the Product of Agency Action that is Arbitrary, Capricious, and Not in Accordance with Law**

**(Actionable Under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))**

93.    Plaintiff incorporates the paragraphs above as if set forth fully herein.

94.    Under 5 U.S.C. § 706(2)(A), the Court may hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

95.    For the reasons explained in the preceding paragraphs, CMS's calculation of CareFirst's 2026 Star Ratings for contract H7379, as released on October 9, 2025, was arbitrary, capricious, and not in accordance with law.

96.    First, CMS did not follow its own guidance in replacing the July 2024 Report from Acumen (reporting on YOS 2023 PDE data) with the September 2024 Report from Acumen after the end of the second plan preview period. That CMS appreciated the departure from its April 2023 guidance is made evident by the fact that Acumen backdated its *September* report to July 31, 2024.

97.    Second, Acumen—CMS's contracted vendor for preparing the reports—mischaracterized the nature of the replacement data as having marginal or no impact, and CMS took no steps to clarify or correct that mischaracterization.

98.    Third, through its inaction in explaining the significance of the changes, CMS failed to provide CareFirst a reasonable opportunity to discover for itself the true nature of the changed data on which CMS would be relying to calculate the 2025 Star Ratings so that CareFirst would at least have had a chance to modify its objectives for the remainder of 2024 and perform to those revised objectives to meet the requisite improvement margin to earn a 4.0 for its 2026 Star Ratings.

99.    Fourth, CMS used the replacement data despite it not being reported and made available to CareFirst until September 30, 2024, more than two weeks after the close of the second preview period. CareFirst thus had no reason to expect at that point in the calendar that any changes would be made requiring scrutiny and potential agency review even if it had been able to identify a problem at the time, which it could not and did not on account of CMS's additional arbitrary and capricious actions and inaction. Thus, on multiple grounds, CareFirst was denied the benefit of the formal preview period and procedures set out in CMS's regulations.

100.    Fifth, even using the data reported by Acumen in the September 2024 Report, CareFirst missed the "significant improvement" cut-off by a statistically insignificant margin. Given the objective of the Star Rating program to create a level playing field on which Medicare plans are rated and can be judged based on objective data, it was arbitrary and capricious for CMS to deny CareFirst the benefit of a 4-Star Drug Plan Quality Improvement Measure rating.

101.    Agencies have an obligation to follow their regulations. Agencies must also adhere to their guidance when that guidance is relied on by regulated entities, or at least be transparent in their departures from that guidance so as to give regulated entities an opportunity to adjust expectations. Agencies may not, through their actions or inaction, "hide the ball" so as to deprive regulated entities of a level playing field.

102.    CMS's errors and oversights in 2024 are the direct cause of CareFirst receiving, in October 2025, a 2026 Star Rating of 3.5 instead of a 4.0.

103.    As a result of CMS's unlawful and arbitrary and capricious action leading to a 3.5 2026 Star Rating, CareFirst's ability to provide competitive and meaningful benefits to Medicare Beneficiaries in the Washington D.C., Maryland, and Virginia service area will be significantly limited as a result of it receiving approximately $32 million less than it should in its 2027 Quality Bonus Payment.

104.    This result can be avoided if CMS recalculates CareFirst's 2026 Star Rating for contract H7379 by excluding the Medication Adherence for Hypertension measure from the calculation of the Drug Plan Quality Improvement measure rating, and in turn from the overall Star Rating.

105.    Plaintiffs therefore respectfully request the relief as prayed for below.

## PRAYER FOR RELIEF

The Administrative Procedure Act directs the courts to "hold unlawful and set aside agency action...found to be," *inter alia*, "arbitrary," "capricious," or "not in accordance with law." 5 U.S.C. § 706(2)(A).

WHEREFORE, Plaintiff respectfully asks the Court to issue a judgment in their favor and:

A. Set aside, as arbitrary, capricious, or otherwise not in accordance with law CareFirst's 2026 Star Ratings for contract H7379 as announced by CMS on October 9, 2025;

B. Order CMS to recalculate CareFirst's 2026 Star Ratings for contract H7379 by removing the Medication Adherence for Hypertension measure from the

calculation of the Drug Plan Quality Improvement measure, consistent with CMS's existing authorities to do so.

C.   Order CMS to use the recalculated 2026 Star Ratings for CareFirst for purposes of calculating the associated Quality Bonus Payment and for all other purposes for which the 2026 Star Ratings are relevant; and

D.   Award CareFirst any other relief the Court may deem just and proper, including costs and fees, as permitted by law.

Dated:  January 20, 2026

/s/ Daniel W. Wolff
Daniel W. Wolff (D.C. Bar #486733)
DWolff@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 624-2621

Steven D. Hamilton (*pro hac vice* forthcoming)
StevenHamilton@crowell.com
CROWELL & MORING LLP
455 North Cityfront Plaza Drive, Suite 3600
Chicago, IL 60611
Telephone: (312) 379-7615

*Counsel for Plaintiff CareFirst Advantage PPO, Inc. (d/b/a CareFirst)*