**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAREFIRST ADVANTAGE PPO, INC. | Civil Action No. 26-cv-150-AHA |
| Plaintiff, | |
| v. | |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS ...................................................................................3

I.  CAREFIRST IS A HEALTH INSURER THAT OPERATES MEDICARE ADVANTAGE PLANS IN D.C., MARYLAND, AND VIRGINIA ...............3

STATUTORY AND REGULATORY BACKGROUND.......................................3

    A.  Medicare Advantage ....................................................................3

    B.  Star Ratings ................................................................................5

        1.  Background ......................................................................5

        2.  Calculating Star Ratings ................................................5

        3.  Quality Bonus Payment for Medicare Advantage plans.........6

        4.  Informal agency review ..................................................9

    C.  Drug Plan Quality Improvement Measure ...................................9

        1.  Calculating the Drug Plan Quality Improvement Measure.......9

FACTUAL BACKGROUND................................................................................11

    A.  Data Used to Generate 2025 Star Ratings...................................11

    B.  CareFirst's 2026 Star Rating Score...........................................17

    C.  CareFirst Petition to CMS for Relief ........................................19

STANDARD OF REVIEW ..................................................................................22

ARGUMENT .......................................................................................................23

I.  CMS'S FAILURE TO FOLLOW ITS OWN GUIDANCE WAS NOT IN ACCORDANCE WITH LAW. .................................................................24

II.  CMS'S GENERATION OF CAREFIRST'S 2026 STAR RATINGS WAS ARBITRARY AND CAPRICIOUS. .........................................................26

    A.  CMS Caused CareFirst Harm by Inducing Detrimental Reliance. .....26

    B.  CMS Denied CareFirst the Opportunity to Adjust its Performance. .......30

    C.  CareFirst's 2026 Star Rating is Inherently Arbitrary and Capricious. ....................................................................................31

III.  THE COURT SHOULD ORDER CMS TO RECALCULATE CAREFIRST'S 2026 STAR RATING. ..................................................32

CONCLUSION....................................................................................................32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allina Health Servs. v. Sebelius,*
   746 F.3d 1102 (D.C. Cir. 2014) ........................................................................................28

*Am. Bioscience, Inc. v. Thompson,*
   269 F.3d 1077 (D.C. Cir. 2001) ........................................................................................22

*Battle v. FAA,*
   393 F.3d 1330 (D.C. Cir. 2005) ...................................................................................22, 25

*Christopher v. SmithKline Beecham Corp.,*
   567 U.S. 142 (2012) ...........................................................................................................29

*Damus v. Nielsen,*
   313 F. Supp. 3d 317 (D.D.C. 2018) .............................................................................22, 25

*Elevance Health, Inc. v. Becerra,*
   736 F. Supp. 3d 1 (D.D.C. 2024) .............................................................................5, 25, 32

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ...........................................................................................................30

*FCC v. Fox Television Stations, Inc.,*
   567 U.S. 239 (2012) ...........................................................................................................29

*Lopez v. FAA,*
   318 F.3d 242 (D.C. Cir. 2003) ..........................................................................................25

*Montilla v. I.N.S.,*
   926 F.2d 162 (2d Cir. 1991) ..............................................................................................25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) .............................................................................................................22

*Nat'l Conservative Pol. Action Comm. v. Fed. Election Comm'n,*
   626 F.2d 953 (D.C. Cir. 1980) ..........................................................................................28

*Portland Cement Ass'n v. EPA,*
   665 F.3d 177 (D.C. Cir. 2011) ..........................................................................................31

*Rai Care Ctrs. of Md. I, LLC v. OPM,*
   No. 18-3151, 2024 WL 3694433 (D.D.C. Aug. 7, 2024) ..................................................31

*Satellite Broad. Co. v. FCC*,
    824 F.2d 1 (D.C. Cir. 1987) .................................................................22, 29

*Sheble v. Huerta*,
    755 F.3d 954 (D.C. Cir. 2014) .......................................................................25

*United States ex rel. Accardi v. Shaughnessy*,
    347 U.S. 260 (1954) ...............................................................22, 23, 24, 25

*UnitedHealthcare Benefits of Tex., Inc. v. CMS*,
    No. 24-cv-357, 2024 WL 4870771 (E.D. Tex. Nov. 22, 2024)........................26, 29

**Statutes**

5 U.S.C. § 706(2)(A) ...........................................................................................22

42 U.S.C. 1395w-21(e)(2)(G) ...............................................................................9

42 U.S.C. § 1395 *et seq.* ...................................................................................3, 4

42 U.S.C. §§ 1395c-1395i-6 ..............................................................................3

42 U.S.C. §§ 1395j-1395w-6 .............................................................................3

42 U.S.C. § 1395w-21 .........................................................................................6

42 U.S.C. §§ 1395w-21-1395w-29 .....................................................................4

42 U.S.C. § 1395w-21(d) .....................................................................................5

42 U.S.C. § 1395w-21(e)(3)(B)(v) ......................................................................8

42 U.S.C. § 1395w-22(e) .....................................................................................5

42 U.S.C. § 1395w-23 .........................................................................................4

42 U.S.C. § 1395w-23(a)(1)(B) ..........................................................................4

42 U.S.C. § 1395w-23(a)(1)(E) ..........................................................................4

42 U.S.C. § 1395w-23(b)(2) ...............................................................................8

42 U.S.C. § 1395w-23(o) .....................................................................................7

42 U.S.C. § 1395w-23(o)(4)(A) ..........................................................................6

42 U.S.C. § 1395w-24(a)(1)(A) ..........................................................................8

42 U.S.C. § 1395w-24(b)(1)(C) ..........................................................................7

42 U.S.C. § 1395w-101(c) ...................................................................................5

Pub. L. No. 108-173, 117 Stat. 2066 (2003) ........................................................4

Pub. L. No. 111-148, 124 Stat. 119 (2010) ..........................................................6

**Regulations**

42 C.F.R. § 422.62 ................................................................................................9

42 C.F.R. § 422.160 ......................................................................................6, 7, 9

42 C.F.R. § 422.162 ............................................................................5, 6, 7, 8, 9

42 C.F.R. § 422.164 ...........................................................................................10

42 C.F.R. § 422.166 ......................................................................1, 2, 5, 6, 8 9

42 C.F.R. § 422.254 ..............................................................................................8

42 C.F.R. § 422.260 ....................................................................................9, 20, 21

42 C.F.R. § 422.266 ..............................................................................................7

42 C.F.R. §§ 422.2265 ..........................................................................................8

42 C.F.R. § 423.180 ..............................................................................................7

42 C.F.R. § 423.182 ..............................................................................................5

42 C.F.R. § 423.186 ......................................................................................5, 6, 8

42 C.F.R. § 423.265 ..............................................................................................8

42 C.F.R. § 423.325 ..............................................................................................8

**Rules**

Fed. R. Civ. P. 56 ................................................................................................1

Local Civil Rule 7 ...............................................................................................1

**Other Authorities**

69 Fed. Reg. 46866 (Aug. 3, 2004) .....................................................................6

75 Fed. Reg. 71190 (Nov. 22, 2010) ....................................................................7

83 Fed. Reg. 16440 (Apr. 16, 2018) .....................................................................5

89 Fed. Reg. 30448 (Apr. 23, 2024) ................................................................................29

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7, Plaintiff CareFirst Advantage PPO, Inc. ("CareFirst") respectfully moves for summary judgment against Defendants, and respectfully asks that the Court order Defendant Centers for Medicare & Medicaid Services ("CMS") to recalculate CareFirst's 2026 Star Rating on the grounds that the original rating is the result of agency action that is arbitrary, capricious, and not in accordance with law.

## INTRODUCTION

At its core, this case is simple: An agency acts contrary to law and arbitrary and capriciously when it publishes guidance on which regulated entities rely, and then the agency does not follow its own guidance. And an agency acts arbitrarily and capriciously if it does not adequately explain its actions or inactions, or if the agency action or inaction is not supported by reasoned decision-making. This case challenges CMS's action that was both contrary to law and arbitrary and capricious in calculating CareFirst's 2026 Star Ratings—specifically, Star measure D04 ("Measure D04")—when CMS departed from its own clear guidance and failed to explain why.

Central to this case is Star Measure D04, which is called the Drug Plan Quality Improvement Measure. Measure D04 is intended to calculate whether Medicare Advantage plans significantly improve in certain categories from year to year, such as members adhering to medication regimes. Measure D04 is based upon annual "patient safety" reports issued by CMS's contractor, Acumen, LLC ("Acumen"). In April 2023 (like in previous years), CMS issued annual guidance (the "April 2023 Guidance") expressly stating that Acumen would release the final Year-of-Service ("YOS") 2023 patient safety reports in July 2024 (the "July 2024 Report"), and the data from that July 2024 Report would be used to calculate Measure D04. *See* A.R. 1-6. This was important because any errors in the July 2024 Report can be raised with CMS during the two Stars "plan preview periods" that CMS makes available every August and September. *See* 42 C.F.R. §

422.166(h). CareFirst reasonably relied on CMS's April 2023 Guidance in evaluating the "preview" of its 2025 Star Rating, as supplied by CMS.

Yet, *after the July 2024 Report* was issued and *after the close of the two plan preview periods*, Acumen issued a *new report* on September 30, 2024 that contained "corrected" data (the "September 2024 Report"). CMS then used the data from the September 2024 Report to calculate the health plans' ultimate 2025 Star Rating in October 2024 and 2026 Star Ratings in October 2025. Notably, due to the methodology on how Measure D04 is calculated—and the way in which Acumen downplayed the change in data with no clarification from CMS—the material impact of using the data from the September 2024 Report, instead of the July 2024 Report, did not become apparent until CMS issued CareFirst's 2026 Star Rating. CareFirst's 2026 Star Rating is lower than it would have been had CMS used the data released in the July 2024 Report as required by CMS's April 2023 Guidance or, at the very least, been transparent about its departure from its April 2023 Guidance so as to give CareFirst sufficient notice to make operational changes in the remaining months of 2024 after the updated data was released on September 30, 2024.

The consequences to CareFirst from CMS failing to follow its own guidance are substantial: because of CMS's actions and, in some respects, inaction, CareFirst is facing an estimated $32 million shortfall in lost Quality Bonus Payments under the Medicare Advantage program. Importantly, these Quality Bonus Payments do **not** go to CareFirst's bottom line—rather, they take the form of increased payments from the government that CareFirst by law must use to reduce member premiums and enhance member benefits. As a result of that loss, CareFirst will be substantially limited in its ability to provide competitive and meaningful benefits to its Medicare Beneficiaries in its service area.

Because CareFirst's 2026 Star Rating is the result of agency action that is contrary to law or, at least, arbitrary and capricious, the Court should grant summary judgment to CareFirst and order CMS to recalculate CareFirst's 2026 Star Rating as explained below.

## STATEMENT OF FACTS

### I.    CAREFIRST IS A HEALTH INSURER THAT OPERATES MEDICARE ADVANTAGE PLANS IN D.C., MARYLAND, AND VIRGINIA

CareFirst is the largest health care insurer in the Mid-Atlantic region and has been providing health solutions to millions of regional residents for decades. Among other health plans, CareFirst offers Medicare Advantage plans and Medicare Prescription Drug plans. Among other Medicare contracts, CareFirst has entered into contract H7379 with CMS to provide coverage to Medicare beneficiaries under Medicare Parts C and D. Under contract H7379, CareFirst offers multiple Medicare plans covering approximately 30,000 members in DC and Maryland.

## STATUTORY AND REGULATORY BACKGROUND

### A.    Medicare Advantage

Medicare is a federal program that is administered by the Centers for Medicare & Medicaid Services ("CMS") and provides health benefits for Americans aged 65 years and older and certain disabled persons. *See* 42 U.S.C. § 1395 *et seq.*

Medicare is divided into different parts to cover various aspects of health care. Medicare Part A covers inpatient hospital stays, skilled nursing facilities, hospice care, and some home health care. Medicare Part B covers outpatient care, doctor visits, preventative services, certain home health care, and durable medical equipment. 42 U.S.C. §§ 1395c to 1395i-6 (Part A); 42 U.S.C. §§ 1395j to 1395w-6 (Part B). Under Medicare Parts A and B—together referred to as "traditional" or "original" Medicare—the federal government itself acts as the insurer and directly pays providers for services rendered to Medicare beneficiaries.

In 1997, Congress created Medicare Part C ("Medicare Advantage"). 42 U.S.C. §§ 1395w-21 to 1395w-29. Medicare Advantage allows individuals to receive Medicare benefits through private health insurers that contract with the federal government. The Medicare Advantage program is a popular option among Medicare beneficiaries—comprising more than 50% of the Medicare population—and is intended to shift the financial risk of providing health care coverage from the federal government to privately run plans.

Medicare Advantage plans must provide members with at least the same level of benefits offered by traditional Medicare. Medicare Advantage plans combine coverage from both Parts A and B and are often offered with prescription drug coverage under Medicare Part D, which was introduced in 2003 as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066 (2003), specifically to provide prescription drug benefits. 42 U.S.C. § 1395 *et seq*.

Through the 2003 MMA, Congress overhauled Medicare and significantly altered the way Medicare Advantage plans are paid. The MMA set the minimum payment for private plans to at least as high as traditional Medicare spending per enrollee. These payments are paid on a pre-determined monthly sum for each Medicare beneficiary. *Id.* § 1395w-23.

The MMA also established an annual bidding process, whereby the statute requires plans to submit a bid by the first Monday in June of each year that represents the estimated cost for the plan to provide basic Medicare benefits to members for the coming year, including administrative overhead and profit. *See id.* § 1395w-23(a)(1)(B). If the plan's bid is lower than the county-level benchmark set by CMS based on traditional Medicare spending per enrollee, CMS returns a portion of the savings to the plans as a "rebate," which the plan must use to fund additional benefits or reduce premiums (or both). *See id.* § 1395w-23(a)(1)(E).

B.    **Star Ratings**

1.    **Background**

Medicare Star Ratings are a key component of the Medicare program. The Star Ratings Program is designed to identify higher quality Medicare Advantage plans.

CMS introduced the current Medicare Star Ratings system in 2007. CMS develops and publicly posts a five-Star[1] rating system for Medicare Advantage plans as part of its responsibility to disseminate comparative information, including information about quality, to Medicare beneficiaries under sections 1851(d) and 1860D-1(c) of the Social Security Act and based on the collection of different types of quality data under section 1852(e). 42 U.S.C. §§ 1395w-21(d), 1395w-101(c), and 1395w-22(e). Star Ratings are intended to reflect accurately a "plan's quality" be based on data that are "complete, accurate, reliable, and valid." 83 Fed. Reg. 16440, 16520 (Apr. 16, 2018). *See also Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 5 (D.D.C. 2024).

2.    **Calculating Star Ratings**

Star Ratings are based on the scores plans earn on various quality and performance "measure[s]." *See* 42 C.F.R. §§ 422.162(a), 423.182(a).[2] To calculate a Medicare Advantage plan's overall Star Rating, each measure receives a measure-specific numerical score based on an analysis of the data identified by CMS for that measure ("Measure Score"). 42 C.F.R. § 422.162(a). CMS then converts that numerical score into a measure-specific Star Rating by determining "cut

---

[1]    Star Ratings are based on a five-Star scale, set in half-Star increments: one Star is the lowest rating, and five Stars is the highest rating. *See* 42 C.F.R. §§ 422.162(a), (b), 422.166(d)(2)(iv), 422.166(h), 423.182(a), (b), 423.186(d)(2)(iv), 423.186(h).

[2]    For example, for the 2026 Star Ratings, Medicare Advantage Prescription Drug (MA-PD) contracts were rated on up to 43 unique quality and performance measures, Medicare Advantage-only contracts (without Part D coverage) were rated on up to 33 measures, and PDP contracts were rated on up to 12 measures.

points" to separate each measure into whole Star increments ("Measure Star"). 42 C.F.R. §§ 422.162(a), 422.166(a)(4), 423.186(a)(4).

Measure Scores are based upon various data sources such as performance measures from the Healthcare Effectiveness Data and Information Set ("HEDIS") and Consumer Assessment of Healthcare Providers and Systems ("CAHPS") surveys. 42 C.F.R. § 422.162(a); *see also* 69 Fed. Reg. 46866, 46886 (Aug. 3, 2004). In addition, the Measure Stars for all contracts are determined by the clustering of Measure Scores to create groups (clusters) that minimize the variance of scores within the clusters, which are then used to identify cut points resulting in five levels (one for each Star Rating). Measure Stars are then used on a weighted basis to calculate the overall Star Rating. *See* 42 C.F.R. §§ 422.166(a), 422.162(a).

CMS intends for Star Ratings to aid Medicare beneficiaries in comparing the quality of health plans to select a plan. *See, e.g.*, 42 C.F.R. § 422.160(b). Prospective Medicare plan members may view the ratings online through CMS's Medicare Plan Finder website, as CMS prominently displays Star Ratings online and in print resources, as required under the Social Security Act. *See* 42 U.S.C. § 1395w-21. This tool displays all Medicare plans available for enrollment to a Medicare beneficiary, and it ranks the plans from "highest" to "lowest" based on their Star Ratings.

### 3. Quality Bonus Payment for Medicare Advantage plans

In 2010, the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), introduced the Quality Bonus Payment program. This program entitles a Medicare Advantage plan to a Quality Bonus Payment ("QBP") from CMS depending on the "quality rating" of the plan, which "shall be determined according to a 5-star rating system[.]" 42 U.S.C. § 1395w-23(o)(4)(A). In other words, Congress tied the QBPs and their amount to a plan's Star Rating.

The QBP program incorporated Star Ratings into two statutory formulas to determine certain payments to Medicare Advantage plans. *See* 42 C.F.R. §§ 422.160(b)(2), 423.180(b)(2); 75 Fed. Reg. 71190, 71218 (Nov. 22, 2010). The first rewards Medicare Advantage plans rated four Stars or higher with an increased benchmark against which to bid. 42 U.S.C. § 1395w-23(o). The second gives higher rated plans a larger portion of the difference between their bid and their benchmark back as a rebate. *Id.* § 1395w-24(b)(1)(C). That is, when Medicare Advantage plans project expenses below a CMS-determined benchmark, a portion of the savings is returned to the plan and is to be used to offer supplemental benefits to Medicare beneficiaries.[3]

In this way, Star Ratings not only play an important role in marketing a plan's quality to Medicare beneficiaries—they substantially impact plan economics and benefit offerings by making more funds available to spend on supplemental benefits for enrollees or to lower premiums. Since the cost of premiums is a significant factor for beneficiaries when selecting a plan, lower costs provide a distinct advantage for plans. Each year's Star Ratings are based upon certain data sets that vary from measure to measure. Typically, final Star Ratings for a given plan year are officially published the preceding October, before the start of the enrollment period for that year (*e.g.*, the 2026 Star Ratings were published in October 2025, so Medicare beneficiaries looking at enrollment options for plan year 2026 had the benefit of those ratings).

For Medicare Advantage plans, one year's Star Rating dictates the QBP issued in the following calendar year. 42 C.F.R. § 422.162(b)(4). For example, QBPs stemming from 2026 Star Ratings are paid out to the receiving plan in 2027, in the form of a higher benchmark and greater percentage of rebate allowance. 42 C.F.R. § 422.162(b)(4). Importantly, though, knowing the QBP

---

[3]     The amount of rebate dollars paid varies based on Star Rating: plans at or above 4.5 Stars retain 70 percent of the difference as rebate dollars; plans at 3.5 or 4 Stars retain 65 percent; and plans at or below 3 Stars retain only 50 percent. 42 C.F.R. § 422.266.

is necessary to prepare a Medicare Advantage plan's bid to CMS for the following plan year. So again taking the 2026 Star Ratings as an example, the resulting 2027 QBP will be released by April 2026 so that plans can factor the financial implications of the 2027 QBP into their actuarial analyses for purposes of designing their bids for the 2027 plan year. 42 C.F.R. § 422.162(b)(4).

It is because of this sequence that time is always of the essence if a plan disputes its Star Rating (and resulting QBP).

The following depicts the typical calendar of relevant occurrences:

| Medicare Star Ratings – Key Annual Events | | |
|---|---|---|
| First Monday in June | Statutory bid deadline | 42 U.S.C. § 1395w-24(a)(1)(A); 42 C.F.R. § 422.254(a)(1); 42 C.F.R. § 423.265(b)(1) |
| Late June | Final Prescription Drug Event (PDE) submission deadline | 42 C.F.R. § 423.325 |
| Late July | Final patient safety reports released (approximately one month after PDE submission deadline) | CMS Memo to Plans: see e.g., UPDATES - 2023 Medicare Part D Patient Safety Reports; UPDATES - 2022 Medicare Part D Patient Safety Reports |
| Aug./Sept. | Plan Previews 1 and 2 | *See* Advance Notice of Methodological Changes for Calendar Year (CY) 2026 for Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies (p. 109); *see also* 42 U.S.C. § 1395w-23(b)(2); 42 C.F.R. §§ 422.166(h)(2), 423.186(h)(2) |
| Early- to Mid-October | Star Ratings published on Medicare Plan Finder | 42 C.F.R. § 422.166(h); *see also* 42 C.F.R. §§ 422.2265(c)(iv); 422.2267(a)(13) |
| Oct. 15 – Dec. 7 | Annual Election Period | 42 U.S.C. § 1395w-21(e)(3)(B)(v); |

| Medicare Star Ratings – Key Annual Events | | |
|---|---|---|
| | | 42 C.F.R. § 422.62(a)(2)(iii) |
| Jan. 1 to March 31 | Medicare Advantage Open Enrollment | 42 U.S.C. 1395w-21(e)(2)(G) |
| April | QBP released (to be paid the following year) | 42 C.F.R. §§ 422.162(b)(4), 422.160. |

### 4.    Informal agency review

For a limited set of issues, a Medicare Advantage plan that does not receive the QBP status determination to which it believes it is entitled (because its Star Rating is lower than the plan believes it should be) may request reconsideration by CMS and, if still not satisfied, an informal hearing. 42 C.F.R. § 422.260(c)(1), (2). But the scope of this informal process is limited, focusing on "a calculation error" or the use of certain categories of "incorrect data," and "limited to those circumstances where the error could impact an individual measure's value or the overall Star Rating." *Id.* § 422.260(c)(1)(i). A plan may not challenge CMS's methodology for calculating a Star Rating (including the calculation of the overall Star Rating). *See id.* § 422.260(c)(3)(ii). Moreover, CMS regulations expressly state that a Medicare Advantage plan may not request a review based upon data inaccuracies arising in a number of data sources, including Prescription Drug Event ("PDE") data. *See id.* § 422.260(c)(3)(iii).

### C.    Drug Plan Quality Improvement Measure

### 1.    Calculating the Drug Plan Quality Improvement Measure

Among the measures that CMS assessed in connection with its calculation of the 2026 Star Ratings is the "Drug Plan Quality Improvement Measure." This measure is intended to reflect a drug plan's performance year-over-year. CMS labels the Drug Plan Quality Improvement Measure with the alphanumeric identifier "D04," and the measure is weighted to the maximum possible Star Ratings weight of 5. *See* A.R. 350–51, 559–60; *see also* 42 C.F.R. § 422.166(e). Whereas

other Star Ratings measures are derived from performance data in a given year, the Drug Plan Quality Improvement Measure (D04) is calculated by comparing a contract's measure scores year-over-year. *See* A.R. 350–51, 559–60; *see also* 42 C.F.R. § 422.164(f). For the measures that feed into the Drug Plan Quality Improvement Measure (D04), plans strive to achieve a status of "significant[] improve[ment]" between the relevant years compared. *See* A.R. 350–51, 559–60.

For purposes of calculating the Drug Plan Quality Improvement Measure (D04), the equation's numerator is the net improvement (the weighted sum of the number of "significantly improved" measures minus the number of "significantly declined" measures), and the denominator is the sum of the weights associated with the measures eligible for the Drug Plan Quality Improvement Measure (D04). *See* A.R. 350–51, 559–60. Significant improvement would be achieved for each measure if the sum of the improvement change score (*i.e.*, the difference between 2025 and 2026 scores) divided by its standard error was greater than 1.96. *See* A.R. 391, 600.

For 2026 Star Ratings, the measures that make up the Drug Plan Quality Improvement Measure (D04) are: "Call Center – Foreign Language Interpreter and TTY Availability" (D01), "Complaints about the Drug Plan" (D02), "Members Choosing to Leave the Plan" (D03), "Rating of Drug Plan" (D05), "Getting Needed Prescription Drugs" (D06), "MPF Price Accuracy" (D07), "Medication Adherence for Diabetes Medications" (D08), "Medication Adherence for Hypertension (RAS antagonists)" (D09), "Medication Adherence for Cholesterol (Statins)" (D10), "MTM Program Completion Rate for CMR" (D11), and "Statin Use in Persons with Diabetes (SUPD)" (D12). *See* A.R. 606. Each of these measures factors into the calculation of the overall Drug Plan Quality Improvement Measure (D04), but for purposes of this lawsuit the only relevant measure that factors into this improvement measure is Medication Adherence for Hypertension (RAS antagonists) (D09).

10

The Medication Adherence for Hypertension Measure (D09) tracks the percentage of plan members with a prescription for a blood pressure medication who fill their prescription often enough to cover 80% or more of the time they are taking the medication. *See* A.R. 568–70. This percentage is calculated as the number of continuously enrolled beneficiaries, 18 years and older, with a proportion of days covered of 80 percent or higher for renin-angiotensin-system ("RAS") antagonist medications during the measurement period (numerator), which is then divided by the number of continuously enrolled beneficiaries, 18 years and older, with at least two relevant medication fills on unique dates of service during the measurement period, and a treatment period that is at least 91 days during the measurement year (denominator). *See* A.R. 568–70.

For 2026 Star Ratings, to determine whether there was "significant improvement" for the Medication Adherence for Hypertension Measure (D09), CMS compared the measure score CareFirst received based on its YOS 2024 PDE data against the measure score CareFirst received based on its YOS 2023 PDE data contained within each years' Acumen final patient safety reports. *See* A.R. 559, 600. The numeric improvement (or decline) is the delta between the earlier (YOS 2023) score and the later (YOS 2024) score. *See* A.R. 600. If that delta is not enough to meet CMS's threshold for "significant improvement," the Drug Plan Quality Improvement Measure (D04) is reduced, which can result in a lower overall Star Rating.

## FACTUAL BACKGROUND

### A.    Data Used to Generate 2025 Star Ratings

As CMS acknowledges in its Star Ratings technical notes, in announcing its "preview" of a forthcoming year's Star Ratings (typically in August), the agency does not automatically provide plans with the raw numeric results for the Drug Plan Quality Improvement Measure (D04). *See* A.R. 270, 485. In fact, the agency does not even publish the raw overall Drug Plan Quality Improvement Measure (D04) Score (as it does for other measures). For Star Ratings "preview"

purposes, CMS provides plans with only the ultimate Measure Rating for the Drug Plan Quality Improvement Measure (D04). The D04 Measure Scores are based on the patient safety reports published by Acumen, that contain PDE data submitted by the plans to CMS. *See* A.R. 1–6, 360–61.

Final patient safety reports containing PDE data from the preceding year are routinely released by Acumen in July of each year, and these final patient safety reports determine the patient safety measure scores—including the Medication Adherence for Hypertension Measure (D09)—that will factor into CMS's calculation of a plan's Star Rating for the following year.[4] This is in line with the agency's precisely planned—and statutorily rooted—calendar for Medicare Advantage plan bid submissions, plan preview periods, and enrollment periods. Unlike the "preview" scores released by CMS, these Acumen patient safety reports provide plans access (via hyperlinks) to the underlying raw numeric scores that drive the measure scores generated by CMS. The July patient safety report released *in advance* of the Star Rating preview from CMS give plans the ability to understand where they stand in terms of raw improvement. It is important that this more detailed information is released early enough so that plans may review the data before the CMS preview scores are released so they are prepared to approach CMS with any calculation concerns during the preview periods.

Consistent with its typical practice, on April 20, 2023, CMS confirmed via a guidance memorandum to plans entitled "UPDATES – 2023 Medicare Part D Patient Safety Reports"—*i.e.*, the "April 2023 Guidance"—that "[t]he final YOS [year-of-service] 2023 Patient Safety Reports will be released in July 2024, one month after the submission deadline for 2023 PDE records to

---

[4]    For instance, 2023 performance data would be reported on in July 2024 for use in calculating the 2025 Star Ratings.

CMS[.]" *See* A.R. 1–6. Simply put, CMS told Medicare Advantage plans that the YOS 2023 data released in the July 2024 Report would be the data plans could rely on to calculate the relevant Measure Scores for use in the 2025 Star Ratings.

And, as promised, on July 31, 2024, CMS (through Acumen) did in fact release the YOS 2023 patient safety reports in the July 2024 Report. *See* A.R. 13–18 (transmittal memo only); 683–687 (data spreadsheet). Subsequent to the release of the July 2024 Report, a CareFirst representative accessed the July 2024 Report and distributed the same to a distribution list that included other CareFirst personnel. *See* Haynes Decl. ¶ 11.

For reference, the following image depicts what CareFirst saw on the face of the July 2024 Report:



*See* Haynes Decl. ¶ 14.

As noted above, hyperlinks within that report allowed CareFirst to review its numeric score. And because CMS said the July report would include the PDE data used for the 2025 Star Ratings, that is what CareFirst relied on for planning purposes. *See* Haynes Decl. ¶ 35.

During the first plan preview period for the 2025 Star Ratings, which ran from August 7 to 14, 2024, CMS released Measure Scores through CMS's Health Plan Management System

(HPMS) that appeared to be, and were, consistent with the July 2024 Report, as depicted in the following image:[5]



*See* A.R. 90.[6]

Then, during the second plan preview period, which ran from September 6 to 13, 2024, CMS released additional Measure Scores via HPMS that again, appeared to be and were consistent with the July 2024 Report, as the following image depicts:

---

[5]    The first column, reflecting CareFirst's contract number at issue in this litigation (H7379), is in "frozen" view on the Excel Spreadsheets for these images for ease of review.

[6]    We note that the administrative record contains documents that appear to be incomplete in some instances and that may be misidentified in the index. For example, for these images depicting the plan preview data, we cite to the location in the administrative record that appears to be related to these images. However, these administrative record pages appear to include excerpts of Excel Spreadsheet plan preview data that are insufficiently placed into context or labeled (*i.e.*, they appear to depict a limited number of "rows" per page) to be able to ensure this with precision.



*See* A.R. 61.

As these images show, CareFirst's score on the Medication Adherence for Hypertension Measure (D09), as previewed by CMS for the 2025 Star Ratings, lined up with what Acumen had reported in the July 2024 Report—the report that contained the PDE data that CMS stated to Medicare Advantage plans in its April 2023 Guidance would be used to generate the 2025 Star Ratings.

Two weeks after the close of this second preview period, on September 30, Acumen sent another email communication to certain plan representatives with the subject line "Patient Safety – Updated Year of Service (YOS) 2023 Reports Available." A.R. 125–31. In that email, Acumen briefly noted that "[t]he YOS 2023 Patient Safety Report Package zip files have been re-uploaded to replace the zip files that were uploaded on July 31, 2024." A.R. 125–31. The email stated further that Acumen had "identified and corrected a minor technical issue in the process that assigns and links PDE and Common Working File (CWF) claims to beneficiaries that impacted a small fraction

of beneficiaries" but that "[t]he impact to the YOS 2023 Patient Safety measure rates for most contracts was marginal or unchanged." A.R. 125–31.

As it turns out, despite CMS's statement in the April 2023 Guidance that it would use the data reported in the July 2024 Report for purposes of calculating a plan's 2025 Star Ratings, CMS did not use the data contained in the July 2024 Report in its 2025 Star Ratings calculations. Rather, it used the "corrected" data contained in the September 2024 Report accompanying Acumen's email to calculate CareFirst's (and other plans') 2025 Star Ratings. Acumen did not explain what the "minor technical issue" was or how the impact for "most contracts was marginal or unchanged." Likewise, CMS did not make any additional statements about the import of the September 2024 Report, and CareFirst had no reason to suspect at the time that anything significant was amiss. *See* Haynes Decl. ¶ 21. There was no communication to plans regarding either the error or the decision to change course on the April 2023 Guidance via the typical route—CMS's HPMS.

Moreover, Acumen's "technical" correction email of September 30, 2024, came more than two weeks *after* the second 2025 Star Rating preview period had already ended on September 13. A.R. 125–31. Therefore, Acumen's September 30 email came at a time when plans had no expectation of receiving communications from Acumen or CMS about final patient safety reports, much less notification of an error outside of the plan preview period, and left no opportunity to raise any concerns about the data with CMS in a timely manner. The email was also released to a limited population of plan representatives through Acumen's portal, and not through HPMS, which is the typical way in which CMS broadly communicates with plans about matters of programmatic import. *See* A.R. 125–31.

CareFirst had no reason on the face of these reports to question Acumen's characterization of its technical correction: CareFirst's 2025 Star Rating did not change as a result of the technical

correction, so the plan had no cause to be concerned or even think the technical error impacted CareFirst's data at all, the "impact" of which on "measure rates for most contracts was," by Acumen's own telling, "marginal or unchanged." *See* A.R. 125–31. Accordingly, CareFirst did not download the September 2024 Report.

### B.    CareFirst's 2026 Star Rating Score

For 2026 Star Ratings, the first plan preview period took place between August 6 and August 13, 2025, and the second plan preview took place in early- to mid-September, 2025. CMS published CareFirst's 2026 Star Rating on October 9, 2025. The calendar of events relevant to the generation of the 2026 Star Ratings is as follows:

| CareFirst 2026 Star Rating – Key Periods and Events | |
|---|---|
| Calendar Year 2023 | Measurement period with the performance data that serve as a baseline for CareFirst's 2026 Star Rating Drug Plan Quality Improvement Measure |
| June 3, 2024 | Statutory bid deadline |
| June 28, 2024 | Final PDE submission deadline |
| July 31, 2024 | Final patient safety reports for YOS 2023 released |
| August 7 – 14, 2024 | Plan Preview 1 for 2025 Star Ratings |
| September 6 – 13, 2024 | Plan Preview 2 for 2025 Star Ratings |
| September 30, 2024 | Acumen issued "corrected" patient safety reports |
| October 10, 2024 | 2025 Star Ratings published |
| October 15, 2024 | Annual Election Period commences |
| January 1, 2025 | Medicare Advantage Open Enrollment commences |
| June 2, 2025 | Statutory bid deadline |
| June 27, 2025 | Final PDE submission deadline |

| July 31, 2025 | Final patient safety reports for YOS 2024 released (the YOS 2024 performance data is used to calculate the Drug Plan Quality Improvement Measure for 2026 Star Ratings against the YOS 2023 baseline score) |
|---|---|
| August 6 – 13, 2025 | Plan Preview 1 for 2026 Star Ratings |
| Early- to Mid-September, 2025 | Plan Preview 2 for 2026 Star Ratings |
| September 15 – 18, 2025 | CareFirst raises to CMS the agency's mistake in not using the July 2024 Report data |
| October 9, 2025 | 2026 Star Ratings published |
| October 15, 2025 | Annual Election Period commences |
| January 1, 2026 | Medicare Advantage Open Enrollment commences |
| June 1, 2026 | Statutory bid deadline |
| June 29, 2026 | Final PDE submission deadline |
| 2027 | Quality Bonus Payment stemming from 2026 Star Ratings paid |

It was not until CareFirst reviewed a lower-than-expected 2026 Measure Star for the Drug Plan Quality Improvement Measure (D04) that it became aware that CMS's use of the updated data for generating its 2025 Star Ratings the preceding year in turn had a material impact on CareFirst's 2026 Star Rating.

As noted above, the numeric improvement (or decline) for this improvement measure is the delta between the earlier (YOS 2023) score and the later (YOS 2024) score. Based on its review and understanding of the two sets of data made available to it by CMS (in 2024 and 2025, respectively), CareFirst had an expectation of receiving a 4-Star Rating for the Drug Plan Quality Improvement Measure (D04) for its 2026 Star Rating calculation, which in turn would have resulted in an overall 4-Star Rating. *See* Haynes Decl. ¶ 22.

As illustrated above, CMS's Measure Scores that are made available to plans via HPMS during the plan preview process only show whole numbers, not the raw, more detailed and precise data actually used to calculate CareFirst's Measure Stars and Overall Rating. Upon receiving CMS's preview of a lower 2026 Star Rating for the Drug Plan Quality Improvement Measure (D04) for the plan than it expected, CareFirst promptly requested from CMS, on September 9, 2025, the raw numeric scores underlying its rating and performed an internal review to understand why its measure score was not the 4 Stars it had been expecting. *See* A.R. 151–52.

Through its internal review of the detailed calculations that it requested from CMS, which provided more precise measurements, CareFirst discovered that the "corrected" data released by Acumen in the September 2024 Report as part of the 2025 Star Rating process—which, curiously, was back-dated to July 31, 2024—had had resulted in one plan member's Hypertension Medication Adherence results "flipping" from non-adherence to adherence. *See* Haynes Decl. ¶ 23. As a result, CareFirst's raw numeric score was slightly elevated in the September 2024 Report from where it had been in the July 2024 Report. And as a result of that slight bump in the YOS 2023 PDE data, the "improvement" in the YOS 2024 PDE data (used to calculate the Hypertension Medication Adherence score that factored into the Drug Plan Quality Improvement Measure (D04) as part of 2026 Star Ratings) was ever-so-slightly under the mark CareFirst was required to meet to quality for "Significant Improvement." Had the Medication Adherence for Hypertension Medications been classified as Significant Improvement, the Part D Drug Plan Quality Improvement rate (D04) would have changed from 3 to 4 Stars, and CareFirst's Overall Rating would have increased from 3.5 to 4.0 Stars.

### C.    CareFirst Petition to CMS for Relief

On September 15, 2025, during the second plan preview period for the 2026 Star Rating, CareFirst emailed CMS to inquire about the improvement scores for the Medication Adherence

measures, noting that the rates used for the baseline 2025 Star Rating did not match the data contained in the July 2024 Report. *See* A.R. 201–09.

CMS responded that the final YOS 2023 July Patient Safety Report Package zip files were re-uploaded to replace the zip files that were originally uploaded with the July 2024 Report due to "minor technical issues in the process that assigns and links Prescription Drug Event (PDE) and the Common Working File (CWF) claims to beneficiaries, which impacted a small fraction of beneficiaries." *See* A.R. 201–09. CMS also stated that it explained in a prior email notification to all Part D contracts that the YOS 2023 patient safety measure rates for most contracts was "marginal or unchanged." *See* A.R. 201–09.

In seeking relief from CMS, CareFirst explained the impact of Acumen's departure from CMS policy and practice in replacing the July 2024 data as follows:

> The stakes of this calculation are substantial. Reaching significant improvement would improve our Part D QI rate to 0.4705888 and to 4 Stars (from 3 Stars). This would then move our Overall Star Rating from a 3.5 to a 4.0 overall. The difference between receiving 3.5 Stars versus 4.0 Stars equates to only 0.64 of a single member. This outcome does not reflect the reality of our performance nor the goals of the Stars program.

A.R. 201–09.

In CMS's email responses, it characterized the issue raised by CareFirst as requesting a "change to the methodology," which is not appealable under CMS's regulations. *See* 42 C.F.R. § 422.260(c)(3)(ii).

Given CMS's characterization of CareFirst's request as one seeking a "change to the methodology," CareFirst does not have any other viable administrative review process available to it. As noted above, although CMS offers an informal, and narrowly tailored, review of QBP status determinations, it expressly excludes from that review process challenges to "the methodology for calculating the star ratings (including the calculation of the overall star ratings),"

20

"the set of measures included in the star rating system," and PDE data accuracy, *inter alia*. *See id.* § 422.260(c)(3)(ii), (iii).

Even still, and out of an abundance of caution, CareFirst submitted a request for reconsideration to CMS pursuant to its informal QBP review process so as not to unwittingly waive any rights. In that request, CareFirst made clear that CMS's own characterization of the dispute as relating to a "change to the methodology" rendered the dispute outside of the administrative appeals process in accordance with 42 C.F.R. § 422.260(c)(3)(ii), but asked that CMS immediately advise CareFirst if its understanding was incorrect so that it may supplement its request with additional documentation:

> Given that 42 C.F.R. § 422.260(c)(3)(ii) states that "an administrative review cannot be requested for . . . the methodology for calculating the star ratings (including the calculation of the overall star ratings) [or] cut-off points for determining measure thresholds," it is CareFirst's understanding that the issues raised herein are not subject to and cannot be brought in the administrative review process. However, CMS has not expressly clarified the meaning of this provision in regulation or guidance. Therefore, in the abundance of caution and in the event that CareFirst's understanding is incorrect and the administrative process is available to address any issues raised herein, please contact the CareFirst designated representative immediately so that CareFirst can submit additional documentation if appropriate. CareFirst reserves all rights, remedies, claims, arguments and otherwise with respect to H7379 and the issues raised herein.

CMS did not contact CareFirst as requested. Instead, on January 15, 2026, CMS emailed CareFirst its "Technical Report," in which it failed to acknowledge its prior characterization and applicable regulations excluding methodological disputes from the administrative appeals process. Rather, CMS opined in its "Technical Report" that "CMS finds no evidence that we incorrectly calculated the Star Rating or measure score for D04. Therefore, the overall rating (QBP rating) for H7379 should remain unchanged."

Because CareFirst cannot obtain relief directly from CMS, it filed this lawsuit.[7]

## STANDARD OF REVIEW

In cases arising under the Administrative Procedure Act, the district court "sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). The APA directs district courts to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

When agencies depart from their own rules or guidance to the prejudice of regulated entities, that agency action is not in accordance with law. *See Damus v. Nielsen*, 313 F. Supp. 3d 317, 336–38 (D.D.C. 2018) (applying the principles set out in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265–67 (1954)); *see also Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005). Furthermore, and irrespective of whether an agency *may* take certain action as a matter of law, to justify any final action affecting regulated entities, the agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted). Where an agency says it will do one thing that induces reasonable reliance by a regulated entity, but then does another, it acts in a manner that is arbitrary and capricious. *See Satellite Broad. Co. v. FCC*, 824 F.2d 1, 3–4 (D.C. Cir. 1987) ("The Commission through its regulatory power cannot, in effect, punish a member of the regulated class for reasonably interpreting Commission rules.").

---

[7]    The day after, on January 21, 2026, CMS officially denied CareFirst's request for reconsideration. In its Reconsideration Determination, CMS made clear that the informal reconsideration process does not apply to challenges to the "methodology for calculating the star ratings." So as to avoid any suggestion it did not pursue all administrative relief, CareFirst requested an informal hearing of that Reconsideration Determination. But because the review process does apply to methodology challenges, that process is futile and thus does not preclude this lawsuit.

**ARGUMENT**

CMS's calculation of CareFirst's 2026 Star Rating was not in accordance with law and arbitrary and capricious for three reasons.

First, CMS's actions were not in accordance with law because CMS said one thing in guidance but then did another without regard to CareFirst's reasonable reliance interests. CMS's April 2023 Guidance expressly stated that the final YOS 2023 patient safety reports released in July 2024 would contain the data CMS would use to generate Medicare Advantage plans' 2025 Star Ratings. Under the *Accardi* doctrine, agencies may not depart from their own guidance to the prejudice of regulated entities, yet CMS did precisely that.

Second, CMS's actions, and in some respects inaction, were arbitrary and capricious. Irrespective of whether CMS was free to ignore its April 2023 Guidance, it did so in a cavalier and nonchalant way that gave CareFirst no reason to know or understand that the data being used to generate its 2025 Star Rating were different from what CareFirst had understood it to be, so that at the very least it could take steps to account for that changed data by modifying its operational performance to meet expectations for purposes of the 2026 Star Ratings. This series of CMS's actions and inaction included:

- Not adhering to its April 2023 Guidance that the YOS 2023 patient safety reports released in July 2024 would contain the data CMS would use to generate Medicare Advantage plans' 2025 Star Ratings.

- Allowing Acumen to release the data actually used to generate the 2025 Star Ratings *two weeks after* the close of the second plan preview period, thus not only after the July 2024 Report, but also after the close of the preview period that plans understand (per CMS regulations) to be the time to raise errors or objections on final calculations.

- Not doing or saying anything to plans after Acumen downplayed the significance of the updated data as having "marginal or unchanged" impact.

- And independent of this series of blunders, the final Star Rating was calculated based on the fact that CareFirst missed the improvement score cut-off by an

23

insignificant amount. Taken on its own terms, the result lacks the force of reasoned decision-making by CMS.

As a result, CareFirst received a 3.5-Star Rating for the 2026 Star Ratings instead of the 4.0-Star Rating it would have received had CMS adhered to its April 2023 Guidance or at least given CareFirst sufficient information to allow it to make operational changes to adjust for the updated data in planning for the 2026 Star Ratings. This in turn means CareFirst will lose approximately $32 million in Quality Bonus Payments for 2027.

Third, CMS's generation of CareFirst's 2026 Star Rating is arbitrary and capricious because, on its own, it is not supported by reasoned decision-making. That is, even if CMS were to use Acumen's data from the September 2024 Report, CareFirst missed the "significant improvement" cut-off point by just 0.034552. CareFirst also pointed out to CMS that by increasing the numerator of the calculation by a mere fraction of a member, that small margin would have disappeared. Since fractions of an individual do not exist, and a full member was not needed to reach significant improvement, the result created a barrier to recognizing actual improvement running contrary to the objective of the Star Rating program. As such, it was arbitrary and capricious for CMS to deny CareFirst the benefit of a 4-Star Drug Plan Quality Improvement Measure (D04) rating even using the data from the September 2024 Report.

The Court should grant summary judgment to CareFirst and order CMS to recalculate its 2026 Star Rating.

## I.   CMS'S FAILURE TO FOLLOW ITS OWN GUIDANCE WAS NOT IN ACCORDANCE WITH LAW.

CMS acted contrary to law when it strayed from its April 2023 Guidance without sufficient notice or explanation. When agencies choose to create guidance and make it public, they must abide by it. *See generally Accardi*, 347 U.S. at 265–67. "*Accardi* has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of

others." *Battle*, 393 F.3d at 1336. This Court has explained that, in certain contexts, the so-called *Accardi* doctrine "can be applied to internal agency guidance." *Damus*, 313 F. Supp. 3d at 336 (citing *Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991) ("The *Accardi* doctrine is premised on fundamental notions of fair play underlying the concept of due process. . . . Its ambit is not limited to rules attaining the status of formal regulations.")).

*Accardi* applies where (1) the agency "fell substantially short" of a procedural requirement and (2) the procedural failure prejudiced the plaintiff. *Sheble v. Huerta*, 755 F.3d 954, 957 (D.C. Cir. 2014) (quoting *Lopez v. FAA*, 318 F.3d 242, 248 (D.C. Cir. 2003)); *see also Elevance Health, Inc.*, 736 F. Supp. 3d at 25 (applying the *Accardi* doctrine in a Stars Ratings challenge). An agency's failure to follow an agency pronouncement where it is required to do so is contrary to law. *See Damus*, 313 F. Supp. 3d at 336-37.

Here, CMS plainly departed from its April 2023 Guidance. Under that guidance, CMS told Medicare Advantage plans like CareFirst that their 2025 Star Ratings would be calculated with the YOS 2023 PDE data released as part of the July 2024 Report. *See* A.R. 3. And yet, CMS did not do that. The final 2025 Star Ratings finalized and announced in October 2024 relied on updated data released by Acumen on September 30, 2024. *See* A.R. 125–31. Indeed, there is no better evidence of CMS's appreciation of the need for it to follow the April 2023 Guidance after telling Medicare Advantage plans that their 2025 Star Ratings would be generated based on the data contained in the July 2024 Report than the fact that the September 2024 Report from Acumen containing the "corrected" data was *back-dated to July 31, 2024*. Why back-date the report of data released a full two months later if the commitment CMS made to Medicare Advantage plans in April 2023 was not obligatory?

Furthermore, CMS's failure to follow its guidance prejudiced CareFirst. Had CMS adhered to its April 2023 Guidance, the data reported by Acumen in the July 2024 Report would have been utilized by CMS for purposes of the 2025 Star Ratings calculations. And had it done so, CareFirst's Medication Adherence for Hypertension Measure (D09) would have been slightly lower than that reported in the September 2024 Report, which in turn would have led to a higher improvement measure score for purposes of the 2026 Star Rating. With the higher improvement score, CareFirst would have received a 4.0 Star Rating for 2026. *See* Haynes Decl. ¶ 22.

## II.    CMS'S GENERATION OF CAREFIRST'S 2026 STAR RATINGS WAS ARBITRARY AND CAPRICIOUS.

### A.    CMS Caused CareFirst Harm by Inducing Detrimental Reliance.

CMS's actions (and in some respects inaction) were also arbitrary and capricious. On its own, CMS's failure to adhere to its April 2023 Guidance that the YOS 2023 patient safety reports released in the July 2024 Report would contain the data CMS would use to generate Medicare Advantage plans' 2025 Star Ratings was arbitrary and capricious. *See, e.g.*, *UnitedHealthcare Benefits of Tex., Inc. v. CMS*, No. 24-cv-357, 2024 WL 4870771, at *4 (E.D. Tex. Nov. 22, 2024) (vacating a Star Rating and ordering CMS to recalculate that rating where it failed in the first instance to follow its guidance, stating "[a]gency action that is contrary to the agency's guidelines may be arbitrary and capricious"). But its departure from its guidance was not the only wrongdoing committed by CMS. Indeed, it was just the first in a series. CMS also allowed Acumen to release the superseding data actually used to generate the 2025 Star Ratings **two weeks after** the close of the second plan preview period. Thus, not only did the actual data used by CMS to generate the 2025 Star Ratings come two months after the July 2024 Report that CMS had said would contain the operative data, but these new data also came more than two weeks after the close of the preview period that plans understand (per CMS regulations) to be the time to raise errors or objections. It

also came not in the form of an official program transmittal from CMS, through the HPMS, but in an email from Acumen to a limited number of CareFirst personnel who have access to the Acumen portal, as CMS allows a limited number of users per plan. Nothing about it conveyed importance.

Indeed, on top of that, Acumen downplayed the significance of the updated data in the September 2024 Report. In its email to plans, Acumen noted that "[t]he YOS 2023 Patient Safety Report Package zip files have been re-uploaded to replace the zip files that were uploaded on July 31, 2024." A.R. 125–31. The communication stated that Acumen had "identified and corrected *a minor technical issue* in the process that assigns and links PDE and Common Working File (CWF) claims to beneficiaries that impacted *a small fraction of beneficiaries*," and that the changes would have a "marginal or unchanged" impact. A.R. 125–31 (emphasis added). In the face of this, CMS did nothing to alert any plan that its Star Rating would, in fact, be changed, or to shed any additional light on the gravity of the update.

Under these circumstances, CareFirst had no reason to know, and in fact did not know, in the last quarter of 2024 that the data released by Acumen in the September 2024 Report would have a material impact on its 2026 Star Ratings targets. It therefore had no reason to take operational measures to adjust its performance targets to allow it to at least have the chance to make up for the changed data impacts before its YOS 2024 performance data was fully baked for purposes of use by CMS in generating CareFirst's 2026 Star Rating.

As noted above, when the July 2024 Report was issued by Acumen, CareFirst reviewed the underlying raw numeric score. When CMS thereafter released the rounded preview scores, CareFirst was able to confirm that the rounded scores were consistent with the underlying raw numeric score that would provide the basis for its measure-level improvement score for the 2026 Star Ratings. It had no reason to know, based on Acumen's and CMS's messaging about the

relevant 2023 PDE data for the 2025 Star Ratings, the mere "technical" correction made in the September 2024 Report, and the timing of that latter report, that it should re-confirm the underlying raw numeric score. So it did not. *See* Haynes Decl. ¶ 21.

All of these mishaps, mistakes, and silences permitted by CMS prejudiced CareFirst, and are arbitrary and capricious both individually and in combination. "Agencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departures." *Nat'l Conservative Pol. Action Comm. v. Fed. Election Comm'n*, 626 F.2d 953, 959 (D.C. Cir. 1980). The D.C. Circuit has emphasized agencies are not entitled to pull a "surprise switcheroo on regulated entities." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1108 (D.C. Cir. 2014) (internal quotation marks and citation omitted). Here, CMS did not follow its own guidance in replacing the July 2024 Report from Acumen with the September 2024 Report from Acumen after the end of the second plan preview period. That CMS appreciated the departure from its April 2023 Guidance is made evident by the fact that Acumen backdated its September 2024 Report to July 31, 2024. And yet, CMS did nothing to clarify the significance of the new data.

There can be no doubt that CMS intended Medicare Advantage plans to rely on its April 2023 Guidance—that is why the guidance exists. And CareFirst did in fact rely on that guidance, especially since it was consistent with CMS's standard annual practice. *See* Haynes Decl. ¶ 9. In light of CMS's departure from its guidance, it at the very least had an obligation to make it crystal clear to Medicare Advantage plans that they should scrutinize the data released in the September 2024 Report since it was that data that would be used to generate the 2025 Star Ratings. *See Nat'l Conservative Pol. Action Comm*, 626 F.2d at 959 ("In addition, prior notice is required where a private party justifiably relies upon an agency's past practice and is substantially affected by a

change in that practice."). Agencies may not, through their actions or inaction, "hide the ball" and deprive regulated entities of a level playing field. Where an agency says it will do one thing that induces reasonable reliance by a regulated entity, but then does another, it acts in a manner that is arbitrary and capricious. *See Satellite Broad. Co., 824 F.2d at 3–4.*

The Eastern District of Texas confronted just this type of scenario in another recent Star Ratings lawsuit. There, CMS announced through guidance that it would evaluate "call center" performance in a particular way, but then in practice did something different without informing the affected health plans in advance. The court rejected the government's position, saying that CMS, after announcing how it will evaluate performance, "cannot later use a different metric system to evaluate a plan's performance[.]" *UnitedHealthcare Benefits of Tex., Inc.*, 2024 WL 4870771, at *4.

Changing the rules of engagement on Medicare Advantage plans is especially unfair where the data by which the regulated entity is being judged is dense and complex. In its own rulemakings on the subject, CMS has acknowledged how time-consuming it can be to review the patient safety measure data. *See, e.g.*, 89 Fed. Reg. 30448, 30643 (Apr. 23, 2024) ("Reviewing administrative data for the Patient Safety measures is a time-consuming process … the final measure rates, which are calculated in July after the end of the measurement period, would require increased processing time to calculate."). The same principles that animate decisions vacating agency enforcement actions where important reliance interests would be upset or the agency failed to provide "fair notice" of how a rule should be interpreted should apply here. *See generally Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (recognizing "the principle that agencies should provide regulated parties 'fair warning of the conduct'" required of them to avoid the type of "'unfair surprise' against which our cases have long warned") (cleaned up); *FCC v. Fox*

*Television Stations, Inc.*, 567 U.S. 239, 258 (2012) (setting aside agency action because the agency failed to provide fair notice); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (holding "[i]t would be arbitrary or capricious" to permit agency action that contradicts earlier agency action that "engendered serious reliance interests").

Given its understandable reliance on the April 2023 Guidance that the PDE data released by Acumen in the July 2024 Report would be used to generate the 2025 Star Ratings, CareFirst was entitled to "fair notice" of the updated data CMS actually decided to use, with sufficient lead time to adjust for the operational impacts of that corrected data before it had material consequences to its business.

In updating the YOS 2023 PDE data but downplaying its significance in the process, Acumen and CMS basically threw CareFirst off the scent—it never had a reasonable chance to understand the implications of the substitute data.

**B.    CMS Denied CareFirst the Opportunity to Adjust its Performance.**

CMS's lack of transparency about the impact of Acumen's replacement of the July 2024 Report with its September 2024 Report deprived CareFirst of adequate notice of the change and an opportunity to make adjustments to its performance targets for the final quarter of 2024 to allow it to make up the difference and position itself fairly for a 4.0 Star Rating for 2026. Because the information reported by Acumen obscured any change to CareFirst's Drug Plan Quality Improvement Measure (D04) score as part of the 2025 Star Rating, CareFirst had no reason to suspect that the September 2024 Report had the potential to skew its performance objectives for the following Star Rating year.

Moreover, by utilizing data reported by Acumen only after the close of the preview period, CMS denied CareFirst any process to raise an objection in the plan preview period. But even worse, because of Acumen's opacity and CMS's inaction, CareFirst was denied even an informal

opportunity to raise an objection to CMS. Had the magnitude of the change to CareFirst's raw score for the Medication Adherence for Hypertension Measure (D09) component of the Drug Plan Quality Improvement Measure (D04) been identified to CareFirst rather than obscured, CareFirst could have at least had the opportunity to adjust its performance objectives for 2024 and then perform to those adjusted objectives in the lead-up to the 2026 Star Ratings process, as explained in the declaration of Elizabeth Haynes, the Vice President of Quality, Stars, and Risk Adjustment of CareFirst Advantage PPO, Inc. *See* Haynes Decl. ¶ 35.

**C.    CareFirst's 2026 Star Rating is Inherently Arbitrary and Capricious.**

There is an additional reason the 2026 Star Rating CMS generated for CareFirst is arbitrary and capricious: on its own, it is not supported by reasoned decision-making. *See Portland Cement Ass'n v. EPA*, 665 F.3d 177, 188 (D.C. Cir. 2011) ("The importance of reasoned decisionmaking in an agency action cannot be overemphasized.") (internal quotation marks and citation omitted); *Rai Care Ctrs. of Md. I, LLC v. OPM*, No. 18-3151, 2024 WL 3694433, at *18 (D.D.C. Aug. 7, 2024) (granting motion for summary judgement because "[t]he record lacks an explanation sufficient to enable the Court to conclude that the agency's actions were the product of reasoned decisionmaking.") (cleaned up). Even using the data reported by Acumen in the September 2024 Report on their own terms, CareFirst missed the "significant improvement" cut-off by just an insignificant margin. CareFirst explained this to CMS during the 2026 Star Rating preview period when it pointed out that the measure rate gap resulting from the updated data was just 0.034552, and that the gap would reduce to 0 by the addition of a fraction of a member to the calculation, specifically 0.64 of a member. Since fractions of individuals do not exist, and a full member was not needed to meet CMS's threshold of significant improvement, CMS's determination created a barrier to recognizing actual improvement. *See* A.R. 69–77, 201–09. CMS's response was the cold shoulder: in essence, responding to CareFirst that there will always be winners and losers, so tough

31

luck. *See* A.R. 69–77, 201–09. But given the objective of the Star Rating program to create a level playing field on which Medicare plans are rated and can be judged based on objective data, it was arbitrary and capricious for CMS to deny CareFirst the benefit of a 4-Star Drug Plan Quality Improvement Measure (D04) rating on so thin a reed.

## III.    THE COURT SHOULD ORDER CMS TO RECALCULATE CAREFIRST'S 2026 STAR RATING.

CMS's errors and oversights in 2024 are the direct cause of CareFirst receiving, in October 2025, a 2026 Star Rating of 3.5 instead of a 4.0. As a result of CMS's unlawful and arbitrary and capricious action leading to a 3.5 2026 Star Rating, CareFirst's ability to provide competitive and meaningful benefits to Medicare Beneficiaries in the Washington D.C. and Maryland service area will be significantly limited as a result of it receiving approximately $32 million less than it should in its 2027 Quality Bonus Payment.

This result can be avoided if CMS recalculates CareFirst's 2026 Star Rating for contract H7379 by either excluding the Medication Adherence for Hypertension Measure (D09) from the calculation of the Drug Plan Quality Improvement Measure (D04) rating, or by using the data contained in the July 2024 Report to calculate the D04 score. *Elevance Health, Inc.*, 736 F. Supp. 3d at 25–26 (instructing CMS to recalculate plaintiff's Star Rating because when an agency acts contrary to its own regulations, the resulting agency action is arbitrary and capricious).

## CONCLUSION

For the reasons given, the Court should grant summary judgment to CareFirst and order CMS to recalculate CareFirst's 2026 Star Rating by either excluding the Medication Adherence for Hypertension Measure (D09) from the calculation of the Drug Plan Quality Improvement Measure (D04) score, or by using the data contained in the July 2024 Report to calculate the D04 score.

Dated: March 4, 2026                  Respectfully submitted,


By: /s/ Daniel W. Wolff
    Daniel W. Wolff, D.C. Bar No. 486733
    CROWELL & MORING LLP
    1001 Pennsylvania Avenue, N.W.
    Washington, DC 20004-2595
    (202) 624-2500
    dwolff@crowell.com

    Steven D. Hamilton (*pro hac vice*
    forthcoming)
    CROWELL & MORING LLP
    455 North Cityfront Plaza Drive
    Suite 3600
    Chicago, IL 60611
    (312) 379-7615
    shamilton@crowell.com

    *Attorneys for Plaintiff*

\