UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CAREFIRST ADVANTAGE PPO, INC.,

        Plaintiff,

    v.

DEPARTMENT OF HEALTH AND HUMAN
SERVICES, *et al.*,

        Defendants.

Civil Action No. 26-0150 (AHA)

**DEFENDANTS' COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY
JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF**

## TABLE OF CONTENTS

Table of Contents ..................................................................................................... i

Table of Authorities ............................................................................................... iii

Background .............................................................................................................. 2

    I.      Statutory and Regulatory Background ...................................................... 2

            A.     Medicare Advantage Quality and Bonus Payments ...................... 4

            B.     The Drug Plan Quality Improvement and Medication Adherence for Hypertension Measures ........................................................... 7

            C.     Patient Safety Data Preview and Plan Preview Processes ........................ 9

    II.     Procedural History ................................................................................... 10

STANDARD OF REVIEW ................................................................................... 16

ARGUMENT ......................................................................................................... 18

    I.      CMS's Data Correction Was in Accordance with Law. ....................................... 18

            A.     The Language of the Medicare Statute Supports CMS's Correction of Known Errors ........................................................ 18

            B.     CMS's Data Correction Was Supported by Its Inherent Authority to Revisit Prior Decisions. ................................................. 20

            C.     No Data CMS Made Available as Part of the Star Ratings Plan Preview Process Is Final Until Public Release in October. ................................... 23

            D.     CMS's April 20, 2023 Memorandum Did Not Require It to Use Incorrect Data to Calculate CareFirst's Star Rating ................................. 25

            E.     *Accardi* Is Inapposite. ............................................................... 30

    II.     CMS's Corrections to the July 2024 Patient Safety Data Were Not Arbitrary and Capricious. ................................................................................. 32

            A.     CMS's Correction of the July 2024 Patient Safety Data Was Reasonable. ............................................................................. 33

            B.     Acumen's Notice to Part D Sponsors that the Patient Safety Data Had Been Corrected Was Sufficient ................................................. 36

    III.    Remand to CMS Would Be Improper. ................................................. 41

- ii -

Conclusion ................................................................................................................................ 42

# TABLE OF AUTHORITIES

*Am. Trucking Ass'ns, Inc. v. Frisco*,
  358 U.S. 133 (1958) .................................................................................................. 22

*Assoc. of Flight Attendants-CWA, AFL-CIO v. Huerta*,
  785 F.3d 710 (D.C. Cir. 2015) ...................................................................... 27, 28, 29

*Belville Mining Co. v. United States*,
  999 F.2d 989–02 (6th Cir. 1993) .............................................................................. 22

*Bookman v. United States*,
  453 F.2d 1263–66 (Ct. Cl. 1972) .............................................................................. 22

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974) .................................................................................................. 17

*Calcutt v. Federal Deposit Ins. Corp.*,
  598 U.S. 623 (2023) .................................................................................................. 41

*Cape Cod Hosp. v. Sebelius*,
  630 F.3d 203 (D.C. Cir. 2011) .................................................................................. 20

*Combat Veterans for Cong. Political Action Comm. v. FEC*,
  795 F.3d 151 (D.C. Cir. 2015) .................................................................................. 39

*County of Los Angeles v. Shalala*,
  192 F.3d 1005 (D.C. Cir. 1999) ............................................................................ 16-17

*Ctr. for Food Safety v. Salazar*,
  898 F. Supp. 2d 130 (D.D.C. 2012) .......................................................................... 17

*Dist. Hosp. Partners, L.P. v. Burwell*,
  786 F.3d 46 (D.C. Cir. 2015) ................................................................................. 17-18

*Elevance Health Inc. v. Kennedy*,
  795 F. Supp. 3d. 861 (N.D. Tex. 2025) ........................................................ 34, 35, 36

*Gentiva Healthcare Corp. v. Sebelius*,
  857 F. Supp. 2d 1 (D.D.C. 2012) .............................................................................. 17

*HMO Louisiana, Inc. v. Dep't of Health and Hum. Servs.*,
  793 F. Supp. 3d 150 (D.D.C. 2025) ........................................................ 23-24, 26, 41

*In re Grand Jury Subpoena, Judith Miller*,
  438 F.3d 1 (D.C. Cir. 2006) ...................................................................................... 31

*Ivy Sports Med., LLC v. Burwell*,
  767 F.3d 81 (D.C. Cir. 2014) ................................................................................. 20-21

*Kentucky Riverkeeper, Inc. v. Rowlette*,
  714 F.3d 402 (6th Cir. 2013) .................................................................................... 33

*Little Sisters of the Poor v. Pennsylvania*,
591 U.S. 657 (2020) ........................................................................................................... 39

*Magellan Tech., Inc. v. FDA*,
70 F.4th 622 (2d Cir. 2023) ............................................................................................... 39

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) ........................................................................................................... 17

*Mazaleski v. Treusdell*,
562 F.2d 701 (D.C. Cir. 1977) ........................................................................................... 22

*\*Methodist Hosp. of Sacramento v. Shalala*,
38 F.3d 1225, 1229 (D.C. Cir. 1994)………………………………………………...19, 20

*Morton v. Ruiz*,
415 U.S. 199 (1974)........................................................................................................... 31

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................................................................. 17

*Native Vill. of Point Hope v. Jewell*,
740 F.3d 489–03 (9th Cir. 2014) ....................................................................................... 33

*Nat'l Conservative Pol. Action Comm. v. FEC*,
626 F.2d 953 (D.C. Cir. 1980) ........................................................................................... 29

*Office of Personal Mgmt. v. Richmond*,
496 U.S. 414 (1990) ........................................................................................................... 30

*Orion Rsrv. Ltd. P'ship v. Salazar*,
553 F.3d 697 (D.C. Cir. 2009) ........................................................................................... 38

*Petal Gas Storage, L.L.C., v. FERC*,
496 F.3d 695 (D.C. Cir. 2007) ........................................................................................... 18

*\*Resolute Forest Prod., Inc. v. U.S. Dep't of Agric.*,
187 F. Supp. 3d 100 (D.D.C. 2016) ................................................................................... 33

*Salt Lake Cmty. Action Program v. Shalala*,
11 F.3d 1 (D.C. Cir. 1993) ................................................................................................. 38

*Scotts Valley Band of Pomo Indians*,
Civ. A. No. 25-00958 (TNM), 2025 WL 3034885 (D.D.C 2025) ..................................... 22

*Se. Ala. Med. Ctr. v. Sebelius*,
572 F.3d 912 (D.C. Cir. 2009) ........................................................................................... 16

*Segar v. Smith*,
783 F.2d 1 (D.C. Cir. 1984) ........................................................................................... 35-36

*Shinseki v. Sanders*,
556 U.S. 396 (2009) ........................................................................................................... 39

*Sierra Club v. EPA*,
    671 F.3d 955–66 (9th Cir. 2012) ........................................................................................ 34

*\*Sierra Club v. EPA*,
    873 F.3d 946 (D.C. 2017) ...................................................................................... 27, 28, 29

*\*Syncor Int'l Corp. v. Shalala*,
    127 F.3d 90 (D.C. Cir. 1997) ...................................................................................... 27, 28

*United States ex rel. Accardi v. Shaughnessy*,
    347 U.S. 260 (1954) ............................................................................................................ 30

*United States ex rel. Spay v. CVS Caremark Corp.*,
    875 F.3d 746 (3d Cir. 2017) ............................................................................................... 3

*Wages & White Lion Invs., L.L.C.*,
    604 U.S. 541 (2025) ............................................................................................................ 41

**Statutes**

5 U.S.C. § 706 ............................................................................................................. 16, 17, 39

42 U.S.C. § 1395 .............................................................. 2, 3, 4, 5, 6, 9, 18, 19, 20, 22, 23

**Regulations**

42 C.F.R. § 422 ......................................................... 4, 5, 6, 7, 8, 9, 16, 23, 34, 39

42 C.F.R. § 423 ................................................................................................................... 19

42 C.F.R. § 1395w-23 .......................................................................................................... 5

Pursuant to Federal Rule of Civil Procedure 56(a), Defendants the Department of Health and Human Services, and the Centers for Medicare & Medicaid Services ("CMS"), by and through undersigned counsel, respectfully cross-move for summary judgment. This motion is combined with Defendants' opposition to the motion by Plaintiff CareFirst Advantage PPO, Inc. ("CareFirst") for summary judgment.

CMS calculates Medicare Advantage Star Ratings on a one- through five-star scale in half-star increments, which allows Medicare beneficiaries to comparison shop among hundreds of private health insurance plans. The Star Ratings system is also the basis for Medicare payment to Medicare Advantage organizations like CareFirst. This lawsuit is CareFirst's effort to nudge its scores over the line into the next half-star category to increase its Medicare payment. As part of this pursuit, CareFirst asks this Court to endorse rule changes to the calculation of Medicare Advantage Star Ratings that CareFirst has not before and would never advance as neutral, policy principles before it knew its overall scores. CareFirst's dubious, post hoc efforts do not satisfy its legal burden to establish that CMS's determination to use corrected patient safety data was arbitrary and capricious or contrary to law.

CMS acted reasonably and in accordance with law when it corrected known data errors more than a year before issuing CareFirst's 2026 Star Ratings at issue here. CMS's data correction flowed from the Medicare statute, implementing regulations, and its authority to administer the Star Ratings program. CMS's April 2023 memorandum, which explained that 2023 year-end patient safety data would be released in July 2024, did not establish that CMS would not later correct those data if they were incorrect. Further, CMS repeatedly advised Medicare Advantage organizations that all data released before the publication of Star Ratings are non-final and subject to revision. For CMS not to correct this data it had determined to be inaccurate—which CareFirst

does not dispute—would have been arbitrary and capricious. And CMS's September 30, 2024 notice apprising Medicare Advantage organizations that CMS had corrected patient safety data provided plans adequate notice before the publication of Star Ratings. Further, underlying data gave Medicare Advantage organizations sufficient subsequent opportunity to raise objections to the use of corrected data. CareFirst's preferred policy is outcome-driven, and CMS's requirement that improvement on a measurement be statistically significant was not arbitrary or capricious or contrary to law. Finally, given that CareFirst did not download or review the revised patient safety data and that CareFirst would not have objected to the data in 2024 because they *increased* CareFirst's measure D09 performance, any error on the part of CMS was harmless.

Every year, it is a near certainty that some contracts, like CareFirst's, will receive scores that just miss the cut-off for a higher star increment. If this Court grants CareFirst the relief it seeks, it opens its doors to annual, legally and statistically dubious arguments of Medicare Advantage organizations seeking to nudge their scores up into the next half-star category. The Court should reject such efforts at the outset.

## BACKGROUND

### I.     Statutory and Regulatory Background

Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*. ("Medicare statute"), establishes the Medicare program, a federally funded and administered health insurance program for eligible elderly and disabled persons and certain individuals with end stage renal disease. *See* 42 U.S.C. § 1395c. The Secretary administers the Medicare program through CMS, a component agency of the United States Department of Health and Human Services.

The Medicare program is divided into four major components. Part A, the hospital insurance benefit program, provides health insurance coverage for certain inpatient hospital care, post-hospital care in a skilled facility, post-hospital home care services, and other related services.

*See* 42 U.S.C. §§ 1395c, 1395d.  Part B, the supplemental medical insurance benefit program, generally pays for a percentage of certain medical and other health services, including physician services, supplemental to the benefits provided by Part A.  *See* 42 U.S.C. §§ 1395j, 1395k, 1395l. Under Part C, the Medicare Advantage program, a Medicare beneficiary can elect to receive his or her Medicare benefits through a public or private healthcare plan.  *See* 42 U.S.C. § 1395w-21 *et seq*.  Finally, Part D is the voluntary prescription drug benefit program.

Under Part C's Medicare Advantage program, the federal government pays insurers to provide the coverage that participating beneficiaries would otherwise receive through Parts A and B (sometimes known, collectively, as "traditional" Medicare).  *Id.* § 1395w-22(a).  These insurers, known as Medicare Advantage organizations, contract to provide coverage in a particular geographic area.  Beneficiaries can then choose among the plans available where they reside.  *Id.* § 1395w-21(b).  Medicare Advantage organizations receive a predetermined sum for providing coverage to each beneficiary, based in part on the demographic and health characteristics of that beneficiary.  *Id.* § 1395w-23(a)(1)(A), (C).

Like Medicare Advantage, Medicare Part D's prescription drug benefit program "operates as a public-private partnership between [CMS] and . . . private insurance companies called 'Sponsors' that administer prescription drug plans."  *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 749 (3d Cir. 2017).  Prescription drug coverage need not be provided in combination with coverage of non-pharmacy outpatient services, but it may be.  When Medicare Advantage plans also offer prescription drug coverage under Medicare Part D, those dual-purpose

- 3 -

plans are known as MA-PD plans.[1]  *See* 42 U.S.C. § 1395w-101(a)(3).  Medicare Advantage

organizations that offer Part D plans are called Part D sponsors.

### A.  Medicare Advantage Quality and Bonus Payments

Star Ratings are a means by which CMS measures the quality of Medicare Advantage

contracts on a scale of one to five "stars" in half-star increments based on data collected by CMS.

42 U.S.C. § 1395w-23(o)(4)(A); *see also id.* § 1395w-22(e)(3).  Star Ratings are based on the data

collected from Medicare Advantage organizations that "permit[] the measurement of health

outcomes and other indices of quality."  *Id*. §§ 1395w-23(o)(4)(A); 1395w-22(e)(3)(A)(i).  Section

1395w-22(e) provides that "each MA organization shall provide for the collection, analysis, and

reporting of data that permits the measurement of health outcomes and other indices of quality."

42 U.S.C. § 1395w-22(e)(3)(A)(i).  Star Ratings reflect the experiences of beneficiaries in these

plans and assist beneficiaries in finding the best plans for their needs.  Advance Notice of

Methodological Changes for 2026 for Medicare Advantage Capitation Rates & Part C & Part D

Payment Policies, at 109 (Apr. 7, 2025), *available at* https://www.cms.gov/files/document/2026-

announcement.pdf.

CMS has released Star Ratings for Medicare Advantage contracts since 2008.  *See*

Medicare Program; Contract Year 2019 Policy & Technical Changes to the Medicare Advantage,

Medicare Cost Plan, Medicare Fee-for-Service, the Medicare Prescription Drug Benefit Programs,

and the PACE Program, 83 Fed. Reg. 16,440, 16,520 (Apr. 16, 2018).  In 2018, CMS adopted the

regulatory framework for the Star Ratings and since then has used rulemaking to adopt changes in

the methodology and add new measures.  *Id.*; *see also* 42 C.F.R. §§ 422.164(c), (d), 423.184(c),

---

[1]  CareFirst's Medicare Advantage contract at issue offers multiple plan benefit packages. However, this brief will use the phrases Medicare Advantage organization and Medicare Advantage plan to refer to MA-PD plans.

(d).  The 2018 final rule describes the purpose of the Star Ratings system: it "is designed to provide information to the beneficiary that is a true reflection of the plan's quality and encompasses multiple dimensions of high-quality care."  83 Fed. Reg. at 16,520.  Star Ratings are assigned to each individual contract held by a Medicare Advantage organization.  The overall Star Ratings are based on a five-star scale, set in half-star increments, with one star being the lowest rating and five stars being the highest.  *See* 42 U.S.C. §§ 1395w-23(o)(4)(A), 1395w-24(b)(1)(C)(v); 42 C.F.R. §§ 422.162(b); 422.166(h)(1)(ii), 423.182(b), 423.186(h)(1)(ii).

To calculate payments to Medicare Advantage organizations, CMS first determines its "benchmark," based on the per-capita cost of covering Medicare beneficiaries under Parts A and B in the relevant geographic area.  *Id.* § 1395w-23(n); 42 C.F.R. § 422.258.  Each Medicare Advantage organization then submits a "bid," telling CMS what payment the Medicare Advantage organization will accept to cover a beneficiary with an average risk profile in that area.  42 C.F.R. § 422.254.  If the insurer's bid is less than the benchmark, the bid becomes its "base payment"— the amount it is paid for covering a beneficiary of average risk—and the insurer receives a portion of the difference between its bid and the benchmark as a "rebate" that the Medicare Advantage organization can use to fund supplemental benefits for beneficiaries or reduce plan premiums.  42 U.S.C. § 1395w-24(b)(1)(C); 42 C.F.R. § 422.260.  If the Medicare Advantage organization's bid is greater than the benchmark, then the benchmark becomes its base payment, and the insurer must charge beneficiaries a premium to make up the difference.  *See* 42 U.S.C. §§ 1395w-23(a)(1)(B)(ii), 1395w-24(b)(2)(A).

Star Ratings affect payments to Medicare Advantage organizations in two main ways.  First, Medicare Advantage plans that earn a rating of four stars or higher qualify for Medicare Advantage Quality Bonus Payments in the form of an increased benchmark for the contract year

following the ratings year (*e.g.*, the 2026 Star Ratings can increase the Medicare Advantage bidding benchmarks for contract year 2027).   42 U.S.C. § 1395w-23(o)(1) (increasing, for qualifying plans, the applicable percentage that calculates the benchmark); *id*. § 1395w-23(o)(3)(A)(i) (a qualifying plan is one that earns a rating of four stars or higher).  This in turn can allow a Medicare Advantage plan to increase its bid, receive higher rebates, or lower premiums. *See id.* § 1395w-24(b)(1)(C); 42 C.F.R. § 422.260.

Second, Star Ratings affect the level of rebate received by plans that bid below their benchmarks for the contract year following the ratings year (e.g., the 2026 Star Ratings are used to set plans' rebate percentages for contract year 2027).  Plans that earn a rating of four-and-a-half stars or higher receive a rebate of seventy percent of the difference between their bid and the benchmark, while plans that earn three-and-a-half or four stars receive a rebate of sixty-five percent of that difference, and plans that earn less than three-and-a-half stars are eligible for a rebate of fifty percent of that difference. 42 U.S.C. § 1395w-24(b)(1)(C)(v) (listing the "final applicable rebate percentage[s]" by rating); 42 C.F.R. §§ 422.166(a)(2)(ii), 423.186(a)(2)(ii) (same).

CMS publishes the Star Ratings each October for the upcoming year at the contract level, with each plan offered under that contract assigned the contract's rating.  *See* 42 C.F.R. §§ 422.162(b), 422.166, 423.182(b), 423.186.  CMS published the 2025 Star Ratings, for example, in October 2024.  CMS, Fact Sheet – 2025 Medicare Advantage and Part D Star Ratings (Oct. 10, 2024) ("Fact Sheet"), *available at* https://perma.cc/8TLH-G7ZL.  The Star Ratings for a particular year are typically based on data from a period two years prior to the Star Ratings period.  For example, the 2025 Star Ratings were calculated based mostly on 2023 measurement year data; the 2026 Star Ratings were based mostly on 2024 measurement year data.  *See* Administrative Record

("A.R.") 293-370 (indicating "data time frame" for each quality measure for 2025 is primarily 2023), 509-76 (indicating "data time frame" for each quality measure for 2026 is primarily 2024).

To calculate overall Star Ratings, CMS scores Medicare Advantage contracts on approximately 30 to 40 unique quality measures, depending on whether the contracts are Medicare Advantage-only or also include Part D coverage. A.R. 270. These measures relate to five broad categories—outcomes, intermediate outcomes, patient experience, access, and process, *see id.* at 266—and CMS uses a variety of data including administrative and medical record review data and survey-based data. 83 Fed. Reg. at 16,520, 16,525. Measure-level scores are also expressed in "stars" but are awarded in whole-star increments, not half stars like the overall Star Ratings. 42 C.F.R. §§ 422.166(a)(4), 423.186(a)(4).

**B.      The Drug Plan Quality Improvement and Medication Adherence for Hypertension Measures**

Among the measures that CMS assessed in connection with its calculation of the 2026 Star Ratings is the D04 Drug Plan Quality Improvement measure ("measure D04") and D09 Medication Adherence for Hypertension measure ("measure D09"). A.R. 559, 568-70. Generally, the Part D Improvement measure D04 looks across the various Part D Star Ratings measures and determines for each Part D Star Rating measure if there was: "no significant change," "significant improvement," or "significant decline" from the prior year. A.R. 676-77. Measure D04 measures "how much [a] drug plan's performance has improved or declined from one year to the next." *Id.*

For purposes of calculating measure D04, the equation's numerator is the net improvement (the weighted sum of the number of "significantly improved" Part D measures minus the number of "significantly declined" Part D measures), and the denominator is the sum of the weights associated with the measures eligible for the Drug Plan Quality Improvement measure (D04). *See* A.R. 350–51, 559–60. Significant improvement would be achieved for each measure included in

D04 if the improvement change score (*i.e.*, the difference between 2025 and 2026 scores) divided by its standard error was greater than 1.96. *See* A.R. 391, 600. CMS assumes the values are approximately normally distributed, the traditional bell-shaped curve, to determine whether the relative improvement or decline on measures is statistically significant. *See* A.R. 600 ("[f]or each measure, significant improvement or decline between Star Ratings years 2025 and 2026 was determined by a two-sided t-test at the 0.05 significance level."); A.R. 69 ("1.96 being the critical value [z-score] corresponding to a test with significance level alpha = 0.05."). Only improvement that is statistically significant qualifies as "significant improvement." CMS explained that statistical significance "assesses how likely differences observed are due to chance." A.R. 453.

Measure D09 tracks the percentage of plan members with a prescription for a blood pressure medication who fill their prescription often enough to cover 80 percent or more of the time they are taking the medication. *See* A.R. 568–70. For some Part D measures like measure D09, CMS uses Prescription Drug Event data. A.R. 383, 592. Every time a beneficiary fills a prescription under Medicare Part D, a prescription drug plan sponsor must submit a summary record called the Prescription Drug Event ("PDE") data to CMS. *See* Questions and Answers on Obtaining        Prescription        Drug        Event        (PDE)        Data,        *available        at* https://www.cms.gov/medicare/prescription-drug-coverage/prescriptiondrugcovgenin /downloads/partdclaimsdataqa.pdf. PDE data are plan and beneficiary-specific. *Id.* Measure D09 is calculated using PDE data, cross-referenced with the Common Working File ("CWF"). The CWF—the Medicare Part A and Part B beneficiary benefits coordination and pre-payment claims validating system—is used to identify certain diagnoses that are excluded, as well as inpatient and skilled nursing facility stays. A.R. 569; *see also* A.R. 633-34 (proportion of days covered adjustment for inpatient and skilled nursing facility stays).

For 2026 Star Ratings, to determine whether there was "significant improvement" for the Medication Adherence for Hypertension measure (D09), CMS compared the measure score CareFirst received based on its Year of Service ("YOS") 2024 PDE data against the measure score CareFirst received based on its YOS 2023 PDE data. *See* A.R. 600-04. The numeric improvement (or decline) is the delta between the earlier (YOS 2023) score and the later (YOS 2024) score. *See* A.R. 600. If that delta is not enough to meet CMS's threshold for "significant improvement," the Drug Plan Quality Improvement measure (D04) score is reduced relative to what it would be if there was "significant improvement," which can result in a lower overall Star Rating.

C.      **Patient Safety Data Preview and Plan Preview Processes**

The Secretary's regulations provide that "CMS will have plan preview periods before each Star Ratings release during which [Medicare Advantage] organizations can preview their Star Ratings data in [the Health Plan Management System] prior to display on the Medicare Plan Finder." 42 C.F.R. §§ 422.166(h)(2); 422.186(h)(2). CMS has no statutory obligation to preview the data underlying its Star Ratings calculation. *See* 42 U.S.C. § 1395w-23(o)(4). "The purpose of the plan preview is for [Medicare Advantage organizations] to review and raise any questions about their own plan's data prior to the public release of data for all plans on *Medicare.gov*." 83 Fed. Reg. at 16,520. Data shared prior to the release of the final Star Ratings in October as part of the plan preview process are preliminary and subject to change. A.R. 180 ("We remind all contracts that Star Ratings data shared prior to the release of Final Star Ratings in October are preliminary and subject to change."); *see also* A.R. 67, 149.

Part D sponsors have access to monthly Patient Safety Reports via the Patient Safety Analysis Web Portal to compare their performance to overall rates and monitor their progress in improving the Part D patient safety measures over time. A.R. 631. Sponsors may use the website to view and download the reports for performance monitoring. *Id.*

- 9 -

## II.    Procedural History

### A.  Patient Safety Data Preview of YOS 2023 PDE Data

On April 20, 2023, CMS issued a memorandum to all Part D sponsors announcing, among other things, the initial availability of 2023 Patient Safety Reports on the Patient Safety Analysis Web Portal on April 28, 2023.  A.R. 1.  The memo stated that "CMS will report and update monthly 14 patient safety measures through the Patient Safety Analysis Web Portal," including the D09 measure and that "[e]ach month, Part D sponsors may download and review their measure packages." *Id.*  The memorandum stated that the April 28, 2023 data release will report only PDE data from January 1, 2023 to March 31, 2023.  A.R. 2.  It further explained that "the measures in these reports are calculated using 2023 PDE, fee-for-service claims, and encounter data processed up until one month before the release of the report" and that "[e]ach monthly report is updated as more complete 2023 data are submitted and processed."  *Id.*  It further noted that following these monthly data releases, "final YOS 2023 Patient Safety Reports will be released in July 2024, one month after the submission deadline for 2023 PDE record to CMS . . .  The final YOS contract [measure] rates will be used to calculate 2025 Part D Star Ratings."  A.R. 3.  The memorandum indicated that "[Part D] sponsors may monitor their data in the reports and alert CMS if potential errors or anomalies are identified."  *Id.* at 2.

On July 31, 2024, CMS, through its contractor Acumen LLC ("Acumen"), announced that the final Patient Safety Reports based on PDE data from YOS 2023 were available for download through the Patient Safety Analysis Web Portal.  *Id.* at 13-18.  "Final" indicated that this report encompassed all of the data from 2023: "The rates in these reports were calculated using PDE data with dates of service between January 1, 2023 and December 31, 2023 (submitted between January 1, 2024 and June 30, 2024)."  *Id.*  Acumen invited Part D sponsors to email CMS with regard to questions and concerns about policies regarding Part D performance and quality measures.  *Id.*

- 10 -

### B.  2025 Star Ratings Plan Preview

On August 6, 2024, CMS released a memorandum to Medicare Advantage organizations indicating that they could preview their Star Ratings data as part of the first plan preview for the 2025 Star Ratings period.  A.R. 48.  The memorandum stated in bold text that "[d]uring this first plan preview, CMS expects Part C and D sponsors to closely review the methodology and their posted data for each measure.  Sponsors should immediately alert CMS of any suspected data issues or errors in order to allow sufficient time to investigate and process any necessary data corrections."  *Id.*  CMS invited plan sponsors to email comments and questions and indicated that they would be addressed "on a rolling basis and must be received no later than 5:00 p.m. Eastern time on August 14, 2024."  A.R. 49.

On September 5, 2024, CMS released a memorandum to Parts C and D sponsors indicating that they could preview their Star Ratings data as part of the second plan preview.  A.R. 67.  The memorandum indicated that "[t]he second plan preview will be available September 6, 2024 and will end on September 13, 2024 at 5:00 p.m. ET."  *Id.*  Additionally, CMS stated that "[w]e have made measure data revisions and Technical Notes updates following the first plan preview."  *Id.*  CMS indicated that "[t]he 2025 Star Ratings are scheduled to be released via the MPF on Medicare.gov on or about October 10, 2024."  *Id.*  CMS explained that "[d]uring this second plan preview, CMS expects Part C and D sponsors to again closely review their posted data for each measure, as well as their preliminary Star Rating assignments.  Sponsors should *immediately* alert CMS of any suspected data issues or errors during the plan preview in order to allow sufficient time to investigate and process any necessary data corrections."  *Id.* (emphasis in original).  CMS emphasized that updates could be made before publication of the final data in October: "If you

print or save the data displayed on the HPMS Star Rating preview pages, please double check the current values online prior to submitting emails in case any updates have been made." *Id.*

On September 30, 2024, Acumen sent another email communication to certain plan representatives, including those from CareFirst, with the subject line "Patient Safety – Updated Year of Service (YOS) 2023 Reports Available." A.R. 125–31. Acumen stated that it had corrected a technical error:

> We identified and corrected a minor technical issue in the process that assigns and links PDE and Common Working File (CWF) claims to beneficiaries that impacted a small fraction of beneficiaries. The impact to the YOS 2023 Patient Safety measure rates for most contracts was marginal or unchanged. The updated 2025 Part C and D Star Ratings data will be available from CMS in HPMS in early October.

*Id.* CMS indicated that if Part D sponsors "have any questions or concerns about CMS policies regarding Part D performance and quality measures," they should contact CMS "via a listed email address." *Id.*

With respect to CareFirst, the data correction resulted in one plan member's hypertension medication adherence status flipping from non-adherence to adherence, meaning that member filled their prescription with enough frequency to cover 80 percent or more of the time they are taking the blood pressure medication. *Compare* A.R. 683 (under Medication Adherence for Hypertension (RAS Antagonists), Number of Member-Years of Adherent Beneficiaries, 1,581.3) *with* A.R. 19 (under Medication Adherence for Hypertension (RAS Antagonists), Number of Member-Years of Adherent Beneficiaries, 1,582.3). This resulted in a raw score percentage increase from 90.014705 to 90.071628 for measure D09 score, which was used to calculate CareFirst's 2025 Star Rating. A.R. 19, 206-07, 683. In the September to October 2024 timeframe, CareFirst did not download or review the revised final YOS 2023 Patient Safety Report Packages or otherwise challenge its 2025 Star Ratings. *See* A.R. 132.

### C.  2026 Plan Preview

On August 5, 2025, CMS released a memorandum to Parts C and D sponsors indicating that they could preview their Star Ratings data as part of the first plan preview for the 2026 Star Ratings period.  A.R. 133.  The memorandum stated in bold text that "During this first plan preview, CMS expects Part C and D sponsors to closely review the methodology and their posted data for each measure.  Sponsors should immediately alert CMS of any suspected data issues or errors in order to allow sufficient time to investigate and process any necessary data corrections."  *Id.*  CMS invited plan sponsors to email comments and questions and indicated that they would be addressed "on a rolling basis and must be received no later than 5:00 p.m. Eastern time on August 13, 2025.  A.R. 134.

On September 8, 2025, CMS released a memorandum to Parts C and D sponsors indicating that they could preview their Star Ratings data as part of the second plan preview.  A.R. 149.  The memorandum indicated that "[t]he second plan preview will be available September 9, 2025 and will end on September 16, 2025 at 5:00 p.m. ET."  *Id.*  Additionally, CMS stated that "[w]e have made measure data revisions and Technical Notes updates following the first plan preview."  *Id.*  CMS indicated that "[t]he 2026 Star Ratings are scheduled to be released via the MPF on Medicare.gov on or about October 9, 2025."  *Id.*  CMS explained that "[d]uring this second plan preview, CMS expects Part C and D sponsors to again closely review their posted data for each measure, as well as their preliminary Star Rating assignments.  Sponsors should *immediately* alert CMS of any suspected data issues or errors during the plan preview in order to allow sufficient time to investigate and process any necessary data corrections."  *Id.* (emphasis in original). CMS emphasized that updates could be made before publication of the final data in October: "If you print or save the data displayed on the HPMS Star Rating preview pages, please double check the

current values online prior to submitting emails in case any updates have been made." *Id.* On September 11, 2025, CMS issued a memorandum entitled 2026 Star Ratings Marketing Template and Data Disclosure, reminding "all contracts that Star Ratings data shared prior to the release of Final Star Ratings in October are preliminary and subject to change." A.R. 180.

On September 15, 2025, CareFirst asked CMS to review the calculation of the Part D improvement D04 measure score for contract H7379, which compares the measure D09 score for the current Star Ratings period based on 2024 PDE data to the prior period based on 2023 PDE data. A.R. 207. On the same day, CMS responded by reminding CareFirst that patient safety data for 2023 had been updated:

> [L]ast year we notified all Part D contracts that the final YOS 2023 July Patient Safety Report Package zip files were re-uploaded to replace the zip files that were originally uploaded on July 31, 2024 due to minor technical issues in the process that assigns and links Prescription Drug Event (PDE) and the Common Working File (CWF) claims to beneficiaries, which impacted a small fraction of beneficiaries.

A.R. 206. Consequently, CMS advised CareFirst that "[t]he rates in these reports were calculated using the PDE data with dates of service between January 1, 2023, and December 31, 2023 (submitted between January 1, 2023- June 28, 2024)," and the measure D09 score for CareFirst's contract "marginally improved . . . to [90.071628]." *Id.* at 206-07. The increased measure D09 score was used to calculate the improvement scores for 2025 and 2026. *Id.* For the 2026 Star Ratings year, CareFirst's score on measure D09 improved from 90.071628 to 90.982287. A.R. 154. This represented an increase of 0.910659. *Id.* In accordance with its methodology for calculating improvement scores, A.R. 600, CMS divided this improvement change score, 0.910659, by the standard error improvement change for measure D09 score, 0.482249752, *see* A.R. 154. This equaled 1.888355. *See* A.R. 201 (rounding to 1.89). Because this is less than 1.96, A.R. 600, CareFirst's contract scored "no significant improvement" on the D09 measure. A.R.

154. Consequently, it did not impact the numerator of CareFirst's improvement measure score. A.R. 600 ("Net improvement is calculated for each class of measures . . . by subtracting the number of significantly declined measures from the number of significantly improved measures.").

On September 16, 2025, CareFirst stated that the slight increase in its measure D09 score for the prior year caused it to miss the "significant improvement" benchmark for 2026 by a small amount, but that despite missing the benchmark, CareFirst had demonstrated significant improvement. A.R. 203. CareFirst explained that the D04 "measure rate gap of 0.034552," or the amount by which it missed the threshold for "significant improvement," is "equivalent to just 0.64 of a member in the numerator (SY2026 numerator: 1695; SY2026 denominator: 1863)," and that "[s]ince fractional members cannot exist and a full member was not needed to reach statistical significance, this strict calculation creates a barrier to recognizing actual improvement." In other words, had CareFirst's improvement change score of 0.910659 been 0.034552 higher, it would have achieved above the 1.96 necessary to attain "significant improvement" for the D09 measure in 2026. CareFirst further explained: "Reaching significant improvement would improve our Part D [quality improvement] rate to 0.4705888 and to 4 Stars. This would then move our Overall Star Rating from a 3.5 to a 4.0 overall." *Id.* at 206; *see* 560 (to achieve four stars on measure D04, an MA-PD plan is required to score greater than or equal to 0.320439 and less than 0.579545).

On September 18, 2025, CMS responded that "[t]here are other instances where a contract just misses a threshold and we are unable to make changes in these situations since we need to follow the codified methodology." A.R. 201. CMS explained the calculation methodology underlying measure D04: "As is standard in statistical hypothesis testing, a statistically significant result is only obtained if the test-statistic exceeds the specified critical value (1.96 being the critical value corresponding to a test with significance level alpha=0.05, as specified in the technical

- 15 -

notes)." *Id.*  CMS noted that in this case, CareFirst contract's ratio was 1.89, which did not exceed 1.96 and so did not meet the criteria for statistical significance. *Id.*  CMS did not increase CareFirst contract's score.  CareFirst submitted a request for reconsideration to CMS pursuant to its administrative review process to appeal Quality Bonus Payment status determinations. *See* 42 C.F.R. § 422.260.  On January 21, 2026, CMS denied CareFirst's reconsideration request.  Ex. A.

### D.  CareFirst Files Suit

Plaintiff CareFirst Advantage PPO, Inc., filed a complaint claiming that CMS improperly used correct patient safety data to calculate the Star Ratings for its H7379 contract.  Compl., ECF No. 1.  In its motion for summary judgment, CareFirst alleges that CMS failed to act in accordance with law because it relied on corrected data instead of the incorrect July 2024 data.  Pls.' Mem. in Support of Mot. Summ. J. ("Pls.' Br.") at 23, ECF No. 10.   CareFirst contends that because CMS had informed Part D sponsors in April 2023 that patient safety data would be released for review in July 2024, CMS was bound to use that July 2024 data to calculate its 2026 Star Ratings, no matter how inaccurate. *Id.*  CareFirst contends that CMS's actions were arbitrary and capricious because they insufficiently put CareFirst on notice that its Star Ratings might be adversely affected. *Id.* at 23-24.  Lastly, CareFirst contends that its 2026 Star Rating was not supported by reasoned decision-making because CareFirst missed the "significant improvement" cut-off point only by a small amount.

### STANDARD OF REVIEW

In this action under the Medicare statute, judicial review is governed by the standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and decided on an administrative record. *Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 916-17 (D.C. Cir. 2009).  Accordingly, "'the district court does not perform its normal role' but instead 'sits as an appellate tribunal'" resolving legal questions. *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (quoting

*PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995)).  Although the parties move for summary judgment, the "standard set forth in Rule 56(c) . . . does not apply."  *Gentiva Healthcare Corp. v. Sebelius*, 857 F. Supp. 2d 1, 6 (D.D.C. 2012), *aff'd*, 723 F.3d 292 (D.C. Cir. 2013).  Rather, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Id.*

The APA provides for courts to "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).  Under the APA's "arbitrary or capricious" standard, the Court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).  An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).  Even a decision that is not fully explained may be upheld "if the agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

The "arbitrary or capricious" standard is "narrow . . . as courts defer to the agency's expertise."  *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting *Motor Vehicle*, 463 U.S. at 43).  The Court "is not to substitute its judgment for that of the agency."  *Id.*  In Medicare cases, the "'tremendous complexity of the Medicare statute" "adds to the deference which is due to the Secretary's decision.'"  *Dist. Hosp. Partners, L.P. v. Burwell*, 786

F.3d 46, 60 (D.C. Cir. 2015) (quoting *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1229 (D.C. Cir. 1994)). The question is not whether the agency's policy is the "best" or only solution, but whether it is a "reasonable solution." *See Petal Gas Storage, L.L.C., v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007).

## ARGUMENT

### I.     CMS's Data Correction Was in Accordance with Law.

CareFirst argues that CMS was bound to calculate its 2026 Star Ratings using 2023 patient safety data released in July 2024, instead of corrected data released in September 2024, because to do otherwise would constitute a departure from its April 2023 memorandum, which stated that "[t]he final YOS 2023 Patient Safety Reports will be *released* in July 2024, one month after the submission deadline for 2023 PDE record to CMS." A.R. 3 (emphasis added). CMS, however, did not act arbitrarily and capriciously or contrary to law in using corrected 2023 data. CMS's correction was supported by the Medicare statute, implementing regulations, standards of administrative procedure, and its own inherent authority to administer the Star Ratings program. Additionally, CMS repeatedly advised that all data released before the publication of Star Ratings in October are non-final and subject to revision. Further, CMS's April 2023 memorandum did not establish that CMS would not correct data released in July 2024 if those data were incorrect. Any reliance CareFirst placed on the incorrect notion that the patient safety data released in July 2024 would be final was misplaced.

### A.     The Language of the Medicare Statute Supports CMS's Correction of Known Errors.

CMS promptly corrected erroneous data consistent with the terms of Medicare statute. The Medicare statute provides that "[t]he quality rating for a plan shall be determined according to a 5-star rating system (based on the data collected under section 1395w-22(e) of this title)." 42

U.S.C. § 1395w-23(o)(4)(A). Section 1395w-22(e) provides that "each MA organization shall provide for the collection, analysis, and reporting of data that permits the measurement of health outcomes and other indices of quality." 42 U.S.C. § 1395w-22(e)(3)(A)(i). CMS implemented this mandate by requiring Part D sponsors like CareFirst "to collect, analyze, and report data that permit measurements of health outcomes and other indices of quality. Part D sponsors must provide unbiased, *accurate*, and complete quality data described in paragraph (c)(1) of this section to CMS on a timely basis as requested by CMS." 42 C.F.R. § 423.182(c)(2) (emphasis added). "The data used in the ratings must be complete, accurate, reliable, and valid." 83 Fed. Reg. at 16,520, 16,521. And "it is important that the data underlying the ratings are unbiased, accurate, and complete so that the ratings themselves are reliable." *Id.* at 16,532. In accordance with the Medicare statute and its regulations, CMS took measures to ensure that the data used to calculate Star Ratings are accurate, including correcting incorrect data or requiring others to correct data. Indeed, CMS's goal in calculating Star Ratings is "to provide information to the beneficiary that is a true reflection of the plan's quality." *Id.* at 16,520.

The D.C. Circuit has made clear that such statutory requirements support, and even require, corrections of known errors. In *Methodist Hospital of Sacramento v. Shalala*, following publication of an area wage index based on erroneous data, the Secretary promptly issued a corrected wage index. 38 F.3d 1,225, 1,229-35 (D.C. Cir. 1994). The D.C. Circuit concluded that refusal to correct the wage index retroactively was permissible, but that prospective correction was required. *Id.* at 1,225, 1,229-35 ("Administrative proceedings and judicial review could . . . provide a meaningful corrective remedy [prospectively] if, for example, the Secretary refused to make any revision to an erroneous wage index."). The court in *Methodist Hospital* reasoned that the Secretary was required to correct the wage index based on the Medicare statute's general

- 19 -

requirement that "[t]he Secretary shall adjust the [wage-related portion of the federal rates] for area differences in hospital wage levels by a factor reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level." *Methodist Hospital of Sacramento*, 38 F.3d at 1,229-30 (quoting 42 U.S.C. § 1395ww(d)(2)(h)). The D.C. Circuit later affirmed that *Methodist Hospital* stands for the proposition that "refusal to correct the wage index going forward would be impermissible." *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 214 (D.C. Cir. 2011). The court in *Cape Code Hospital* determined that "the mandatory language ('The Secretary *shall adjust*')", *Methodist Hosp.,* 38 F.3d at 1,230 (quoting § 1395ww(d)(2)(h)), indicated that "refusal to correct the wage index going forward would be impermissible." *Cape Cod Hosp.*, 630 F.3d at 215.

Likewise, the language of the Medicare statute pertaining to Star Ratings is similar: "[t]he quality rating for a plan *shall be determined* according to a 5-star rating system (based on the data collected under section 1395w-22(e) of this title)." 42 U.S.C. § 1395w-23(o)(4)(A) (emphasis added). The statute thus requires that the 5-Star rating system be premised on "data that permits the measurement of health outcomes and other indices of quality." *Id*. § 1395w-22(e)(3)(A)(i). Incorrect data does not permit the measurement of health outcomes and quality. CareFirst falls well short of showing that CMS's correction of inaccurate patient data in 2024 in calculating its 2026 Star Ratings was in violation of the APA.

**B.    CMS's Data Correction Was Supported by Its Inherent Authority to Revisit Prior Decisions.**

CMS's correction of incorrect data prior to the publication of Star Ratings was supported by its independent authority to correct prior decisions. "Administrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions" because "the 'power to reconsider is inherent in the power to decide.'" *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86

(D.C. Cir. 2014) (quoting *Albertson v. FCC*, 182 F.3d 397, 399 (D.C. Cir. 1950) (aggregating cases). That power has limits. *See Scotts Valley Band of Pomo Indians v. Burgum*, Civ. A. No. 25-00958 (TNM), 2025 WL 3034885, at *7 (D.D.C. Oct. 30, 2025). The first comes from Congress: "Agencies cannot revisit past decisions when a statute forbids it or sets out another correction process." *Id.* (citing *Ivy Sports* 767, F.3d at 86). The second comes from timing: Agencies may deploy their inherent reconsideration power only if they do so "in a timely fashion." *Id.* Although there is some debate on the scope of an agency's authority to revisit substantive decisions, *see Voyageur Outward Bound School v. United States*, 444 F. Supp. 3d. 182, 191 (D.D.C. 2020), there is no debate that an agency's authority to correct is at its zenith when it corrects "inadvertent errors," *Am. Trucking Ass'ns, Inc. v. Frisco*, 358 U.S. 133, 145 (1958), that are "ministerial" or "clerical" in nature, *Howard Sober, Inc. v. ICC*, 628 F.2d 36, 40–41 (D.C. Cir. 1980) (determining that the Interstate Commerce Commission could revise a certificate without following normal notice and hearing procedures since it was only fixing a clerical error); *see Voyageur Outward Bound Sch.*, 444 F. Supp. 3d. at 190 ("The 'ministerial error doctrine' stands for the unremarkable proposition that agencies may correct clerical errors even in final *unreviewable* decisions.").

CareFirst does not argue that it was improper for CMS to correct the erroneous data released in July 2024, Haynes ("Declaration") Decl. (ECF No. 10-2) ¶ 32 ("CareFirst does not dispute the accuracy of the updated score reported in September 2024."), only that the data differed from the July 2024 data in a way that one year later prevented it from achieving "significant improvement" in the calculation of the D04 measure score. Pl.'s Br. 19. Acumen's September 30, 2024 email stated that "[t]he YOS 2023 Patient Safety Report Package zip files have been re-uploaded to replace the zip files that were uploaded on July 31, 2024." A.R. 125–31. The email

stated further that Acumen had "identified and corrected a minor technical issue in the process that assigns and links PDE and Common Working File (CWF) claims to beneficiaries that impacted a small fraction of beneficiaries" but that "[t]he impact to the YOS 2023 Patient Safety measure rates for most contracts was marginal or unchanged." A.R. 125–31. The minor technical issue involved linking beneficiary identification, which may change over time, across claims in the measurement period. This issue is a quintessential clerical or ministerial error. *See Am. Trucking Ass'ns, Inc.*, 358 U.S. at 174 (inadvertent omission of relevant restrictions from certificates was clerical error). And there is no evidence that this mismatch was not "inadvertent" or intentional.

CMS's correction of erroneous data was timely. "What is a short and reasonable time period will vary with each case, but absent unusual circumstances, the time period would be measured in weeks, not years." *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977). CMS's September 30, 2024 data correction announcement came "weeks, not years" after its July 31, 2024 initial patient safety data publication—eight weeks and five days to be exact. And eight weeks and five days was timely. *See Scotts Valley*, 2025 WL 3034885, at *8 (ten weeks and six days was timely); *Bookman v. United States*, 453 F.2d 1263, 1264–66 (Ct. Cl. 1972) (upholding three-month period as timely); *Belville Mining Co. v. United States*, 999 F.2d 989, 1,001–02 (6th Cir. 1993) (eight months was timely). Additionally, although CMS was not required to, CMS issued its correction before publication of the final patient safety data and Star Ratings on October 10, 2024. And it certainly did so before the 2026 Star Ratings were issued on October 10, 2025. Finally, CareFirst has not identified any Congressional limitation on CMS's ability to correct data during the plan preview process. As discussed *infra* p. 23, CMS has no statutory obligation to preview the data underlying its Star Ratings calculation. *See* 42 U.S.C. § 1395w-23(o)(4).

Notwithstanding any representation CareFirst claims CMS made in its April 2023 memo, CMS retained its inherent authority to correct the July 2024 patient safety data.

### C. No Data CMS Made Available as Part of the Star Ratings Plan Preview Process Is Final Until Public Release in October.

CMS gave CareFirst sufficient notice that the data it makes available as part of the Star Ratings plan preview process, including the July 2024 patient safety data, is not final until public release of Star Ratings and underlying data. CareFirst had no basis to rely on non-final data released as part of a preview process. CMS has no statutory obligation to preview the data underlying its Star Ratings calculation. *See* 42 U.S.C. § 1395w-23(o)(4). The Secretary's regulations provide that "CMS will have plan preview periods before each Star Ratings release during which [Medicare Advantage] organizations can preview their Star Ratings data in [the Health Plan Management System] prior to display on the Medicare Plan Finder." 42 C.F.R. §§ 422.166(h)(2); 422.186(h)(2). "The purpose of the plan preview is for [Medicare Advantage organizations] to review and raise any questions about their own plan's data prior to the public release of data for all plans on *Medicare.gov*." 83 Fed. Reg. at 16,520. The plan preview process thus "allows for any necessary corrections to be made prior to the Star Ratings data being public." *Id.*

The plan preview process is meant to be an iterative one wherein plans are permitted to informally submit questions and objections to CMS pertaining to the calculation of their Star Ratings before publication so that CMS can consider addressing any concerns or errors before issuing the final Star Ratings determination. *See, e.g.*, A.R. 63-66, 69-77 (plan preview email correspondence between CMS and CareFirst). The data CMS issues privately to a limited number of users on behalf of Medicare Advantage organizations during the plan preview process and its views expressed during informal email exchanges are the "agency's preliminary position[s] during

an informal adjudication." *HMO Louisiana, Inc. v. Dep't of Health and Hum. Servs.*, 793 F. Supp. 3d 150, 157 (D.D.C. 2025), *appeal argued*, No. 25-5269 (D.C. Cir. Feb. 12, 2026).  Definitionally, they are non-final.

CMS repeatedly reminded Medicare Advantage organizations during the plan preview process that data shared prior to the release of the final Star Ratings in October are preliminary and subject to change, including:

- August 6, 2024 memorandum explaining the first plan preview: CMS described the available Star Ratings data for each measure—which included the patient safety measure that is the subject of this litigation—as "preliminary."  A.R. 48 *see also* A.R. 133 (first plan preview, August 5, 2025);

- September 5, 2024 memorandum explaining the second plan preview: CMS explained that "[p]rior to the release of data on the [Medicare Plan Finder], all data in HPMS will be updated with the final 2025 Star Ratings."  A.R. 67, *see also* A.R. 149 (second plan preview, September 8, 2025);

- September 11, 2025 memorandum entitled 2026 Star Ratings Marketing Template and Data Disclosure: CMS stated, "We remind all contracts that Star Ratings data shared prior to the release of Final Star Ratings in October are preliminary and subject to change."  A.R. 180;

- September 16, 2025 email correspondence with CareFirst: CMS explained that "[c]ontracts should focus on reviewing their Star Ratings data in [the Health Plan Management System] during the preview periods since these are the *preliminary* data that we *anticipate* posting on Medicare Plan Finder."  A.R. 72 (emphasis added).

CMS's announcement of a deadline to submit comments and questions does not amount to a representation that CMS will make no subsequent changes to the calculation of Star Ratings in response to those comments and questions. CareFirst alleges that Acumen's September 30, 2024 corrective memorandum "came at a time when plans had no expectation of receiving communications from Acumen or CMS about final patient safety reports, much less notification of an error outside of the plan preview period." Pl.'s. Br. 16. The plan preview process includes two preview windows for submission of feedback, generally in August and September, *see, e.g.*, A.R. 48 (indicating first plan preview period of 2025 was August 7 to August 14, 204), 67 (indicating second plan preview period of 2025 was September 6, 2024 to September 13, 2024). But the plan preview process does not "close" at the end of the second preview period as CareFirst suggests, *see, e.g.*, Pl.'s Br. 2, 15, 23. The end of the preview periods is the deadline to submit comments and questions in the ordinary course. A.R. 68 ("Comments and questions must be received no later than 5:00 p.m. ET on September 13, 2024 and will be addressed on a rolling basis."). Following the close of the comment window, CMS considers comments and questions—some of which lead to error corrections and other Star Ratings calculation changes—until the publication of Star Ratings and underlying data in October. CMS makes changes to the calculation of Star Ratings subsequent to the close of the plan preview windows. CareFirst's expectation that CMS would not send communications notifying it of error corrections after September 30, 2024 is unfounded.

### D.    CMS's April 20, 2023 Memorandum Did Not Require It to Use Incorrect Data to Calculate CareFirst's Star Rating

CareFirst misapprehends CMS's April 20, 2023 Health Plan Management System Memorandum; it did not require CMS to calculate CareFirst's Star Ratings using uncorrected patient safety data released in July 2024. The memorandum stated that "[t]he final YOS 2023

Patient Safety Reports will be *released* in July 2024, one month after the submission deadline for 2023 PDE record to CMS . . .  The final YOS contract [measure] rates will be used to *calculate* 2025 Part D Star Ratings." A.R. 3 (emphasis added).  CareFirst argues that through this guidance, "CMS told Medicare Advantage plans . . . that their 2025 Star Ratings would be calculated with the YOS 2023 PDE data released as part of the July 2024 Report." Pl.'s Br. 25.  CareFirst conflates CMS's representation concerning release of the YOS 2023 PDE data with a guarantee that such data would be used without correction to calculate its 2025 Star Ratings.  Nowhere did the April 2023 memorandum represent that CMS would use the data released in July 2024 to calculate YOS 2023 patient safety measure rates for the 2025 Star Ratings without adjustments or error corrections.  Issuing data corrections was not a "departure," *id.*, from guidance announcing when 2023 patient safety data would be released.

In fact, the April 2023 memorandum explained that the patient safety data released in July 2024 could change.  As CareFirst explained in its brief, the purpose of releasing patient safety reports in July 2024 was to permit Medicare Advantage organizations to identify errors that could result in later-corrected patient safety data: "[the July 2024 patient safety data release] was important because any errors in the July 2024 Report can be raised with CMS during the two Stars 'plan preview periods' that CMS makes available every August and September." Pl.'s Br. 1.  CMS's April 2023 memo gave CareFirst ample notice that the July 2024 released data could subsequently change prior to issuance of CareFirst contract's final Star Rating.  The memorandum instructed that "[s]ponsors may monitor their data in the reports and alert CMS if potential errors or anomalies are identified." A.R. 2.  Consequently, CareFirst was on notice that its underlying patient safety data could change, either because it identified an "error or anomaly" specific to its data or if another Medicare Advantage organization identified a global error.  In releasing patient

safety data in July 2024 and issuing corrected data in September 2024 before final publication of patient safety data and CareFirst's Star Ratings on October 10, 2024, CMS acted consistently with its April 2023 memorandum.

While the April 2023 memorandum uses the word "final" to describe the YOS 2023 patient safety reports released in July 2024, it did so to differentiate between the monthly, incomplete patient safety reports and the completed report, not to indicate that the YOS 2023 patient safety reports released in July 2024 were not subject to revision before final publication in October. *See* A.R. 1-2 ("Each monthly [patient safety] report is updated as more complete 2023 data are submitted and processed."). "Final," in this context, indicates that the patient safety reports will be inclusive of all the 2023 PDE instead of partial 2023 PDE.

Furthermore, CMS's April 2023 memorandum is a policy statement that did not bind the public or the agency. Policy statements "serve[] to 'apprise the regulated community of the agency's intentions.'" *Assoc. of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015) (quoting *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987)). "Policy statements 'are binding on neither the public nor the agency,' and the agency 'retains the discretion and the authority to change its position . . . in any specific case.'" *Sierra Club v. EPA*, 873 F.3d 946, 951 (D.C. 2017) (quoting *Assoc. of Flight Attendants-CWA, AFL-CIO*, 873 F.3d at 716). An agency may even change its position "abruptly," so long as such a change "does not affect the legal norm." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). In determining whether agency guidance qualifies as a policy statement, courts "typically consider: (1) the actual legal effect (or lack thereof) of the agency action in question on regulated entities; (2) the agency's characterization of the guidance; and (3) whether the agency has applied the

guidance as if it were binding on regulated parties." *Sierra Club*, 873 F.3d at 951 (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252-53 (D.C. Cir. 2014)) (internal quotations omitted).

The April 2023 memorandum does not "affect a legal norm." *Syncor Int'l Corp.*, 127 F.3d at 94. Its purpose was to, among other things, "announce the availability of the 2023 Patient Safety Reports on the Patient Safety Analysis Web Portal." A.R. 1. CMS's announcement of the display of patient safety data subject to potential correction had no "actual legal effect" on regulated entities. As established, CMS stated that the patient safety data to be released in July 2024 was subject to change. Access to the patient safety data was strictly circumscribed. *See* A.R. 4 (restricting access to patient safety reports to authorized users and describing the steps for user authorization). The patient safety data had no legal effect on Medicare Advantage organizations until the data were finally published with Star Ratings on October 10, 2024. A.R. 67.

Like EPA's guidance in *Sierra Club*, "this is not a case in which the guidance document signals that the agency 'will not be open to considering approaches other than those prescribed' therein." 873 F.3d at 952 (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 384 (D.C. Cir. 2002). The April 2023 memorandum indicated that CMS was open to considering alternative publication approaches and timelines. It stated that "[t]he Patient Safety Analysis Web Portal facilitates communications between CMS, Part D contracts, and our contractor, Acumen, LLC." A.R. 2. It encouraged Medicare Advantage organizations to "monitor their data in the reports and alert CMS if potential errors or anomalies are identified." *Id.* Finally, CMS indicated that "[a]ny general questions related to the Patient Safety Analysis project should be sent via email to PartCandDStarRatings@cms.hhs.gov." A.R. 6. CMS "affirmatively" indicated that it would "consider and apply improvements" to the release of patient safety data, including by correcting errors. *Sierra Club*, 873 F.3d at 952.

Finally, CMS's April 2023 memorandum did not bind regulated parties; it imposed no "obligation or prohibition" on Part D sponsors. *Assoc. of Flight Attendants-CWA, AFL-CIO*, 873 F.3d at 717. It did not "create a new basis for enforcement or liability." *Id.* The April 2023 memorandum "apprise[d] the public of the agency's intentions," *id.*, and merely announced when CMS would release patient safety data to Medicare Advantage organizations. Consequently, CMS was not bound by its memorandum announcing a timeline for release of preliminary patient safety data. CMS "retain[ed] the discretion and the authority to change its position" with regard to its timeline for release of patient safety data. *Sierra Club*, 873 F.3d at 951.

CareFirst repeatedly argues that it relied on CMS's April 2023 memorandum for the proposition that CMS would never correct the patient safety data. Given the plain language of the April 2023 memorandum and the numerous communications from CMS calling for corrections of this data as late as September 2024, *see supra* at 24-25, any alleged reliance was not justifiable. Unlike in the cases CareFirst cites, any reliance here was misplaced. *See Nat'l Conservative Pol. Action Comm. v. FEC*, 626 F.2d 953, 959 (D.C. Cir. 1980) (plaintiff's reliance was justifiable because FEC announced that advisory opinion requests would be published in its monthly newsletter and the FEC failed to do so). CareFirst also alleges that correcting the July 2024 data amounts to a "surprise switcheroo," Pl.'s Br. (citing *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1108 (D.C. Cir. 2014)). But correcting data is not akin to the "switcheroo" at issue in *Allina*—where the Secretary's proposal to clarify meant that an agency was "open to reconsidering existing policy." *Id.* Similarly, correcting data does not create "unfair surprise," as CareFirst contends. Pl.'s Br. 29 (citing *Christopher v SmithKline Beecham Corp.*, 567 U.S. 142, 155-56 (2012)). In *Christopher*, the Supreme Court refused to defer to the agency because DOL policy that pharmaceutical sales representatives were not excepted from the FLSA overtime requirements

at issue would create unfair surprise after decades-long inaction.  There was no such "decades-long inaction" or change in policy here.  As discussed *supra* p. 21-23, parties have a reasonable expectation that agencies will correct data errors they identify.  CareFirst's insistence that CMS use incorrect data to increase their Star Rating payment is effectively a claim of equitable estoppel, which is foreclosed.  *See Office of Personal Mgmt. v. Richmond*, 496 U.S. 414 (1990) (reliance on government mistake cannot be used to compel the payment of money not authorized by law).  *See Office of Personal Mgmt. v. Richmond*, 496 U.S. 414 (1990) (reliance on government mistake cannot be used to compel the payment of money not authorized by law).  Any reliance CareFirst placed on the incorrect notion that the patient safety data released in July 2024 would be final was misplaced.

### E.    *Accardi* Is Inapposite.

CareFirst contends that *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260 (1954) requires CMS to use incorrect data to calculate its 2026 Star Rating.  Pl.'s Br. 24-25.  CareFirst argues that *Accardi* stands for the broad proposition that "'agencies may not violate their own rules and regulations to the prejudice of others.'"  *Id.* (quoting *Battle v. FAA*, 393 F.3d 1,330, 1,336 (D.C. Cir. 2005)).  *Accardi* is inapposite.  This Court in *Damus v. Nielsen* carefully synthesized the *Accardi* doctrine: "'an agency pronouncement is transformed into a binding norm if so intended by the agency,' a determination that takes into account the substance and intent of the agency action, as well as whether it confers individual protections or privileges."  313 F. Supp. 3d 317 (D.D.C. 2018) (Boasberg, J.) (quoting *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987)).

The *Accardi* doctrine has no application to CMS's April 2023 memorandum because: (1) CMS did not intend to transform its announcement of the release schedule for patient safety data into a norm that the released data would not be later corrected; (2) CMS's intention was that no data released at any time during the plan preview process be considered final; and (3) CMS's

plan preview process is aimed at correcting data errors, which protects regulated entities.  In short, CMS did not "violate [its] own rules and regulations to the prejudice" of CareFirst.  *Battle*, 393 F.3d at 1,336.

As established, CMS's April 2023 memorandum made no representations about potential patient safety data correction.  By issuing the April 2023 memorandum, CMS did not create a norm that patient safety data would not be revised if errors were identified.  The memorandum instructed that "[s]ponsors may monitor their data in the reports and alert CMS if potential errors or anomalies are identified."  A.R. 2.  CareFirst concedes that "any errors in the July 2024 Report can be raised with CMS" subsequently.  Pl.'s Br. 1.  As also established, CMS has made clear that any data released prior to publication of the Star Ratings and underlying data are not final.  *See supra* p. 23-24.  Nothing in CMS's April 2023 memorandum evidences CMS's intention to change its position.

Central to a court's consideration of the *Accardi* doctrine is whether an agency action confers individual protections or privileges.  *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required.").  Regulations considered by the *Morton* court required the publication of directives that "inform the public of privileges and benefits available and of eligibility requirements."  *Id.* (quotation marks omitted).  The Supreme Court "found that the publication requirement was intended to benefit potential beneficiaries and therefore invalidated a Bureau of Indian Affairs attempt to limit general assistance benefits to otherwise eligible beneficiaries based on an unpublished eligibility requirement."  *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1,141, 1153 (D.C. Cir. 2006).  *Morton* is illustrative.

CMS's publication of patient safety data in July 2024, well ahead of its deadline for publication of Star Ratings and underlying data on October 10, 2024, is aimed at allowing Medicare Advantage organizations the ability to validate data and ensuring Medicare Advantage data are correct.  It is for the benefit of Medicare Advantage organizations: "The purpose of the plan preview is for [Medicare Advantage organizations] to review and raise any questions about their own plan's data prior to the public release of data," which "allows for necessary corrections to be made prior to the Star Ratings data being public."  83 Fed. Reg. at 16,520.  Disclosure of data before and during the plan preview process "has evolved to provide more data to [Medicare Advantage organizations] to help validate their data."  *Id.* at 16,588.  Medicare Advantage organizations have likewise "acknowledged the importance of reviewing their data throughout the year."  *Id.*  Consequently, CMS's process is "intended to benefit" Medicare Advantage organizations by providing a protection against inaccurate Star Ratings.  CareFirst's preference that CMS be required to calculate Star Ratings using preliminary data it released in July 2024 is at odds with this process.  Unlike in *Morton*, where the agency failed to follow its regulations requiring publication of beneficial directives, CMS followed its internal procedures aimed at identifying and correcting errors.  The *Accardi* doctrine requires nothing more.  CareFirst repeatedly argues that CMS's failure to utilize the uncorrected July 2024 data in calculating its 2026 Star Ratings caused it "prejudice," *see e.g.*, Pl.'s Br. 26, utilizing the term as shorthand for the notion that use of that data would have increased its Star Rating.  But for the reasons discussed infra p. 40-41, CareFirst was not prejudiced.

## II.    CMS's Corrections to the July 2024 Patient Safety Data Were Not Arbitrary and Capricious.

CMS's determination to use corrected data to calculate CareFirst Star Ratings was not arbitrary and capricious.  In fact, for CMS not to have corrected data it knew to be inaccurate in

calculating the 2026 Star Ratings would have been arbitrary and capricious. CareFirst's preferred policy is outcome-driven and does not accord with basic principles of statistics that require results to be statistically significant in the calculation of the Drug Plan Quality Improvement measure. It is not inherently arbitrary and capricious for contracts to fall a hair's breadth short of the next-highest rating—it is virtually guaranteed in any quality ratings system involving over 1,000 contracts. CMS's September 30, 2024 notice apprising Part D sponsors that patient safety data were corrected was sufficiently conspicuous. It provided Part D sponsors an opportunity to raise objections to the use of corrected data. Finally, in light of the fact that CareFirst did not download or review the revised patient safety data and that CareFirst would not have had a basis to object to the data in 2024 given that it increased CareFirst measure D09 performance and the underlying data used in the calculation of D04, any error on the part of CMS was harmless.

### A.      CMS's Correction of the July 2024 Patient Safety Data Was Reasonable.

CMS's correction of the July 2024 patient safety data was reasonable and reasonably explained. It is *per se* reasonable for CMS to correct incorrect data in calculating Medicare Advantage organizations' Star Ratings. For CMS not to have corrected data it determined to be inaccurate before issuing final Star Ratings would have been arbitrary and capricious. "Where an agency has relied on incorrect or inaccurate data or has not made a reasonable effort to ensure that appropriate data was relied upon, its decision is arbitrary and capricious and should be overturned." *Resolute Forest Prod., Inc. v. Dep't of Agric.*, 187 F. Supp. 3d 100, 123 (D.D.C. 2016); *see, e.g.*, *Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 502–03 (9th Cir. 2014) (overturning agency's determination as arbitrary and capricious after finding agency assumptions were made based on contradictory estimates and without rational basis in record); *Kentucky Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 410 (6th Cir. 2013) (overturning as arbitrary and capricious agency's permit reauthorization where agency relied on inappropriate estimates to gauge impact of

reauthorization); *Sierra Club v. EPA*, 671 F.3d 955, 965–66 (9th Cir. 2012) (overturning as arbitrary and capricious agency's action where it failed to consider newer "data [that] told a different story than . . . earlier data" that agency had actually relied upon and where agency had failed to provide an adequate explanation for its reliance on outdated data). CareFirst does not suggest that the July 2024 patient safety data were accurate before it was corrected. Haynes Decl. (ECF No. 10-2) ¶ 32 ("CareFirst does not dispute the accuracy of the updated score reported in September 2024."). CMS, through its contractor Acumen, had an obligation to correct its error.

CareFirst appears to contend that its contract's 2026 Star Rating was arbitrary and capricious because the contract missed the "significant improvement" cut-off by a seemingly small margin—0.034552. Pl.'s Br. 31. It contends that because it could have achieved the "significant improvement" benchmark by the equivalent of less than one—that is, 0.64 of a member—it was arbitrary and capricious for CMS not to have concluded that CareFirst was close enough. No statute, regulation, or guidance provision requires CMS to round any measure scores up to the next whole member. *See* 42 C.F.R. §§ 422.166(d)(2)(iv); 422.186(d)(2)(iv); 422.162(a); 422.182(a) (CMS must follow "traditional rounding rules"); *see also Elevance Health Inc. v. Kennedy*, 795 F. Supp. 3d. 861, 866 (N.D. Tex. 2025) (explaining CMS's rounding policy). Besides that, as CMS explained, CareFirst is requesting "a change to the methodology for calculating the improvement measures" that would "need to be proposed and finalized through rulemaking," A.R. 70, and its policy proposal would undermine consistency and inject arbitrariness into the Star Ratings process.

Worse, CareFirst's preferred approach is statistically dubious. Generally, the Part D Improvement measure D04 looks across the various Part D Star Ratings measures and determines for each Part D Star Rating measure if there was: "no significant change," "significant improvement," or "significant decline" from the prior year. A.R. 676-77. CMS assumes the values

- 34 -

are approximately normally distributed, the traditional bell-shaped curve, to determine whether the relative improvement or decline on measures is statistically significant. *See* A.R. 600 ("[f]or each measure, significant improvement or decline between Star Ratings years 2025 and 2026 was determined by a two-sided t-test at the 0.05 significance level."); A.R. 69 ("1.96 being the critical value [z-score] corresponding to a test with significance level alpha = 0.05."). CMS explained that statistical significance "assesses how likely differences observed are due to chance." A.R. 453. CMS calculates the "improvement change score" by subtracting, here, the 2025 score on the D09 measure from CareFirst's score on the D09 measure in 2026 (although this is reversed for measures where lower scores are better). A.R. 600. It then divides this figure by the standard error of the improvement change score, which is a measure-specific figure meant to account for the fact that a contract's score on a given measure in one year is not independent of its score in the next year. A.R. 600, 601. If this ratio exceeds 1.96, CMS concludes that the measure change score is not random variation but reflects "significant improvement." *Id.* This captures outcomes on the right tail of the bell curve. If this ratio is lower than -1.96, CMS concludes there was "significant decline." *Id.* This captures outcomes on the left tail of the bell curve. A ratio that falls between - 1.96 and 1.96 standard deviations, that is, in the 95 percent area under the bell curve in the middle, is "no significant change." *Id.*

CareFirst's contract's improvement score ratio for the D09 measure was 1.89, within 1.96 standard deviations of the mean, meaning it scored "no significant change." A.R. 69. CMS should not be required to deviate from its "two-sided t-test at the 0.05 significance level," A.R. 600—that is, determining whether an improvement score falls at either tail of the bell-shaped curve, which is the traditional test for determining statistical significance. *See Segar v. Smith*, 783 F.2d 1,249, 1,282 (D.C. Cir. 1984) ("Although the law has not set any precise level at which statistical

- 35 -

significance can be said to be sufficient . . . social scientists usually accept a study that achieves statistical significance at the .05 level."). CareFirst's preferred policy is outcome-driven and does not accord with basic principles of statistics. As in the *Elevance* Star Ratings matter, this case "has only scratched the surface of the complex process by which CMS collects data and produces Star Ratings. That process involves advanced knowledge of data collection, statistics, and mathematics. In other words, it is not one which a federal court is well suited to second guess." *Elevance Health, Inc.*, 795 F. Supp. 3d at 880.

CareFirst contends that "it was arbitrary and capricious for CMS to deny CareFirst the benefit of a 4-Star Drug Plan Quality Improvement Measure (D04) rating on so thin a reed," Pl.'s Br. 32, appearing to argue that it is *per se* arbitrary for CMS to predicate its Star Ratings system on seemingly small margins. In *Elevance*, the plaintiffs similarly complained that their contract's Star Ratings score, 3.749565, fell short of the 3.75 benchmark for rounding up to 4.0 stars by 0.000435. 795 F. Supp. 3d at 878. CareFirst's "thin reed" is like Elevance's even narrower miss. "In the Star Rating system," however, "it is virtually guaranteed that there will be contracts that fall a hair's breadth short of the next-highest rating." *Id.* at 880. Understandably, CareFirst "would have preferred for those contracts to reach the next half-star tier. But the fact that they fell short does not give rise to a claim for relief under federal law." *Id.* CareFirst has not shown any evidence that CMS acted arbitrarily or capriciously.

**B.      Acumen's Notice to Part D Sponsors that the Patient Safety Data Had Been Corrected Was Sufficient.**

CareFirst argues that CMS insufficiently "conveyed [the] importance" of its September 30, 2024 patient safety data correction and that CMS "downplayed the significance of the updated data." Pl.'s Br. 26-27. Acumen's September 30, 2024 notification was commensurate with "the

gravity of the update." *See id.* at 27.  Acumen's message sufficiently conveyed that the update was important and that CareFirst should review the corrected data.

Acumen's message indicating that a limited number of contracts were impacted by the patient safety data correction was not an indication that the update was unimportant.  As an initial matter, CMS indicated that "[p]atient safety data for most contracts was marginal or unchanged." A.R. 125-31.  CareFirst concedes that the data correction was marginal: "updated data released by Acumen in September 2024 had resulted in one plan member's hypertension medication adherence status flipping from non-adherence to adherence.  Haynes Decl. (ECF No. 10-2) ¶ 23.  This resulted in a raw score percentage increase from 90.014705 to 90.071628.  A.R. 19, 206-07, 683.

CareFirst fails to grapple with the fact that low-probability events in large populations are almost certain to occur.  When an event that has a small chance of occurring—here, where data correction "impacted a small fraction of beneficiaries" and, consequently, "Patient Safety measure rates for most contracts was marginal or unchanged," A.R. 125-31 occurs over hundreds of contracts—it will likely occur with some frequency, despite being rare for any single individual contract.  *See* Enrollment by Contract 2024 01, *available at* https://www.cms.gov/data-research/statistics-trends-and-reports/medicare-advantagepart-d-contract-and-enrollment-data/monthly-enrollment-contract/enrollment-contract-2024-01.  CareFirst makes the unsupported leap from assuming that because an event was unlikely to impact its contract, that event did not impact its contract.  That the impact from the correction for patient safety measure rates for "most contracts [were] marginal or unchanged" was not a representation that CareFirst's contracts were unaffected or that CareFirst should not have checked.

Acumen's message accords with CMS's repeated requests that "Part C and D sponsors . . . closely review the methodology and their posted data for each measure, as well as their preliminary

Star Rating assignments." *See, e.g.*, 83 Fed. Reg. 16,588.  Inherent to Acumen's notice that "[t]he updated 2025 Part C and D Star Ratings data will be available from CMS in [the Health Plan Management System] in early October," followed by a reminder concerning user authorization for web portal access, is that Part D sponsors should review the corrected patient safety data.  A.R. 125-31.  CMS included several methods for contacting CMS and Acumen should they have trouble accessing the reports.  *Id.*  The terms of Acumen's September 30, 2024 correction were accurate, clear, and conspicuous.  The APA requires nothing more.  Acumen's message indicating that error correction impacted a limited number of contracts did not amount to a representation that the update was unimportant or that Part D sponsors should not review the corrected data.  By declining to review the corrected data, Haynes Decl. (ECF No. 10-2) ¶ 10 ("we did not download the September 2024 Report at that time to do further diligence"), *see also* A.R. 132, CareFirst waived any objection.  *Salt Lake Cmty. Action Program v. Shalala*, 11 F.3d 1,084, 1,087 (D.C. Cir. 1993) (identifying "the well-settled premise that objections to agency proceedings must be presented to the agency 'in order to raise issues reviewable by the courts'") (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)); *Orion Rsrv. Ltd. P'ship v. Salazar*, 553 F.3d 697, 707 (D.C. Cir. 2009).  Further, CareFirst does not request that CMS recalculate its 2025 Star Ratings using the lower D09 measure score.

CareFirst contends that Acumen's message concerning the correction of the patient safety data "left no opportunity [for it] to raise any concerns about the data with CMS in a timely manner" and that CareFirst was "denied even an informal opportunity to raise an objection to CMS."  Pl.'s Br. 16, 31.  As established, CMS explicitly requested on September 30, 2024 that Medicare Advantage organizations reach out to it with regard to the patient safety data correction "if you have any questions of concerns."  A.R. 125-31.  This is precisely the kind of informal opportunity

to raise an objection to CMS that CareFirst contends it was denied and which it availed itself several times previously.  A.R. 63-66, 69-77.  CareFirst could have raised objections before October 10, 2024, the date the 2025 Star Ratings were scheduled to be released.[2]  A.R. 67.  It did not.  And it likewise did not subsequently submit a request for reconsideration to CMS pursuant to its administrative review process to appeal Quality Bonus Payment status determinations.  *See* 42 C.F.R. § 422.260.

Any notice defect on the part of CMS was harmless because CareFirst did not download the patient safety data in the relevant timeframe and even if it had, because its score increased, it would not have had a basis for objecting.  The APA provides that "due account shall be taken of the rule of prejudicial error," 5 U.S.C. § 706, which is like "an administrative law harmless error rule,"  *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 684 (2020) (alteration and citation omitted); *see also, e.g.*, *Magellan Tech., Inc. v. FDA*, 70 F.4th 622, 630 (2d Cir. 2023) ("Even assuming that the FDA's decision not to evaluate Magellan's marketing plan as part of its PMTA review was error, any such error was harmless because it did not affect the outcome of the FDA's review."). "The party claiming injury bears the burden of demonstrating harm; the agency need not prove its absence." *Combat Veterans for Cong. Political Action Comm. v. FEC*, 795 F.3d 151, 157 (D.C. Cir. 2015); *see also Shinseki v. Sanders*, 556 U.S. 396, 409-11 (2009) (the "burden of showing that an error is harmful normally falls upon the party attacking the agency's determination").

First, CareFirst did not download the corrected patient safety data.  Haynes Decl. (ECF No. 10.2) ¶ 10 ("[W]e did not download the September 2024 Report at that time to do further

---

[2]     Even if CareFirst raised a potential error following publication of the Star Ratings and underlying data on October 10, 2024, CMS would have made every effort to correct that error.

diligence"); *see also* A.R. 132.  The amount of lead time CMS gave CareFirst in 2024 to analyze, raise concerns about, and object to data that Acumen clearly explained could have changed due to the correction would have been immaterial because of CareFirst's determination not to download the data and ascertain whether it had been affected by the correction.  Even had CareFirst downloaded the September 2024 Report, it would have never objected to the data correction in 2024 because the correction caused CareFirst's D09 measure score to improve.  *See* Pl.'s Br. 19 (explaining that "CareFirst's raw numeric score was slightly elevated in the September 2024 Report from where it had been in the July 2024 Report."); *see also* Haynes Decl. (ECF No. 10.2) ¶ 23 ("the updated data released by Acumen in September 2024 had resulted in one plan member's hypertension medication adherence status flipping from non-adherence to adherence").  What is more, had CMS explained to CareFirst in its September 30, 2024 update exactly the impact the correction had on CareFirst's contract, CareFirst would not have objected given that its measure score improved.  CareFirst has therefore not made (and cannot make) any showing of prejudice as a result of lack of notice.[3]

Second, any action CareFirst would have taken is with the benefit of hindsight.  *See* Haynes Decl. (ECF No. 10.2) ¶ 22 ("Our understanding changed a year a later, however, with CMS's 2026 Star Ratings preview periods, which began in August 2025.").  CareFirst explains that it "would have taken steps to address" the fact that its raw score for the D09 measure was changed only if it knew that the D09 measure changed "in such a way that it would have a downstream, Star Rating-level impact on the [D04 measure] for its 2026 Star Rating."  Haynes (ECF No. 10.2) Decl. ¶ 32.  CareFirst, however, could have only known that the corrected data would impact its D04 measure

---

[3]    While CMS's correction of patient safety data in 2025 caused CareFirst's measure D09 score to slightly increase, it did not result in an increased Star Rating in 2026.  The 2025 measure D09 increase caused CareFirst to miss having "significantly improved" its measure D09 score.

score for the 2026 Star Rating in 2025, not in 2024.  That CareFirst objected to use of the corrected data only in hindsight underscores that there is nothing CMS or CareFirst could have done differently *in 2024* vis-a-vis its 2025 Star Rating (which was not materially impacted by the corrected data).

## III.    Remand to CMS Would Be Improper.

Finally, even if the Court were to find either that CMS's explanation for declining to use incorrect data to calculate CareFirst's Star Rating was insufficient, remand to the agency would be improper.  To be sure, "the better course when an agency error is identified is for the reviewing court, except in rare circumstances, to remand to the agency for additional investigation or explanation." *Wages & White Lion Invs., L.L.C.*, 604 U.S. 541, 587 (2025) (cleaned up).  However, remand may at times be unwarranted.  *See id.* at 589-91.  Remand is especially unwarranted where "there is not the slightest uncertainty as to the outcome of the agency's proceedings on remand" because "the agency was required to take a particular action."  *Calcutt v. Federal Deposit Ins. Corp.*, 598 U.S. 623, 630 (2023) (internal quotations omitted).

Here, "CMS would likely be able to easily cure any defects" by explaining why the patient safety data it ultimately used to calculate CareFirst's contract's Star Rating was corrected.  *HMO Louisiana Inc.*, 793 F. Supp. 3d at 158 n.2.  Additionally, as established, CMS was prohibited from using incorrect data to calculate CareFirst's Star Rating.  *See* supra pp. 19-20.  A remand to CMS would not result in a different outcome.

\*    \*    \*

- 41 -

## CONCLUSION

For these reasons, CMS's actions were not arbitrary, capricious, contrary to law, or in violation of the APA. Therefore, the Court should grant Defendants' cross-motion for summary judgment and deny Plaintiff's motion for summary judgment.

Dated: March 20, 2026

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:    _____*/s/ Allison I. Brown*_____
    ALLISON I. BROWN
    Assistant United States Attorney
    601 D Street, NW
    Washington, DC 20530
    202-252-7822

*Attorneys for the United States of America*

*Of Counsel:*

MICHAEL B. STUART
General Counsel

ELIZABETH C. KELLEY
Deputy General Counsel
Chief Legal Officer for CMS

JOCELYN S. BEER
Acting Deputy Associate General Counsel for Litigation

KENNETH R. WHITLEY
Attorney
Department of Health and Human Services
Office of the General Counsel

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CAREFIRST ADVANTAGE PPO, INC.,

      Plaintiff,

    v.

DEPARTMENT OF HEALTH AND HUMAN
SERVICES, *et al.*,

      Defendants.

Civil Action No. 26-0150 (AHA)

## [PROPOSED] ORDER

UPON CONSIDERATION of Plaintiff's Motion for Summary Judgment, Defendants'

Motion for Summary Judgment, the parties' submissions, and the entire record herein, it is hereby

ORDERED that Plaintiff's Motion is DENIED. It is further

ORDERED that Defendants' Motion is GRANTED. It is further

ORDERED that summary judgment is entered in Defendants' favor as to all claims in the

Complaint. It is further

ORDERED that this matter is dismissed.

SO ORDERED:

_____

Date

_____

AMIR H. ALI
United States District Judge